# United States Court of Appeals
## For the First Circuit

No. 02-2054

IN RE: FBI DISTRIBUTION CORP., F/K/A FILENE'S BASEMENT, INC.;
FBC DISTRIBUTION CORP., F/K/A FILENE'S BASEMENT CORP.,

Debtors.

_____

KATHLEEN MASON,
Appellant,

v.

OFFICIAL COMMITTEE OF UNSECURED CREDITORS,
FOR FBI DISTRIBUTION CORP. AND FBC DISTRIBUTION CORP.,
Appellee.

_____

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Reginald C. Lindsay, U.S. District Judge]

_____

Before

Torruella, Circuit Judge,
Campbell and Stahl, Senior Circuit Judges.

_____

Robert M. Trien, with whom Victor G. Milione, P.C., and Nixon
Peabody LLP, were on brief, for appellant.
Ronald R. Sussman, with whom Christopher A. Jarvinen, Kronish
Lieb Weiner & Hellman LLP, Joseph S.U. Bodoff, and Bodoff &
Associates, were on brief, for appellees.

_____

May 27, 2003

_____

**STAHL**, <u>**Senior Circuit Judge**</u>. This case requires us to decide whether the Chapter 11 debtor in possession must pay in excess of $1.2 million in severance pay, pursuant to the terms of two prepetition contracts, as an administrative expense to an executive who was terminated after rendering postpetition services. We affirm the bankruptcy court's grant of summary judgment, denying administrative priority status to the executive's claim.

**I**

On May 17, 1999, Filene's Basement, Inc. (n/d/b/a FBI Distribution Corp.), then a wholly owned subsidiary of Filene's Basement Corp. (n/d/b/a FBC Distribution Corp.) (collectively, "debtors" or "debtor in possession"),[1] hired Kathleen Mason as President of Filene's Basement Division and Chief Merchandising Officer. Mason left a high-paying position as President of Home Goods, Inc., a subsidiary of TJX Companies, to join Filene's at a time when it was already experiencing financial difficulty.[2] As a prelude to her employment, the parties signed two written

_____

[1]"Debtors" will be used to refer to prepetition activity whereas "debtor in possession" will be used to refer to postpetition activity.

[2]As of May 2, 1999, reported year-to-date losses were $7,528,069 and by October 30, 1999 had grown to $40,975,868. According to Mason's affidavit, prior to entering the Employment Agreement, she knew that Filene's had lost $9.8 million in the fiscal year ending January 31, 1999 and that it had lost money the preceding five years. And within two weeks of her first day of work, the Chairman and Chief Executive Officer of Filene's expressed to her the idea of filing for Chapter 11 relief.

agreements: the Employment Agreement and the Retention Agreement. The Employment Agreement set the initial term of employment at three years and entitled Mason to an annual base salary of $400,000, in addition to fringe benefits, stock options, and bonuses, including a signing bonus of $100,000. It also provided that in the event Mason was terminated without cause, she was entitled to receive three years' salary and other fringe benefits. The Retention Agreement was essentially a golden parachute, which, in general terms, provided that should Mason's employment terminate following a qualifying "Change in Control," she would receive three years' salary plus other benefits, including legal fees and expenses.[3]

On August 23, 1999, Filene's Basement, Inc. and Filene's Basement Corp. filed for relief under Chapter 11 and continued to operate pursuant to sections 1107 and 1108 of the Bankruptcy Code, 11 U.S.C. §§ 1107, 1108, as debtor in possession.[4] Following the filing, Mason continued to render services pursuant to the prepetition Employment Agreement, for which she received her full salary and benefits owed thereunder. According to Mason, she was

---

[3]The Retention Agreement provided that any payments owing under it would be offset by the amount of payment paid under other agreements that entitled Mason to benefits upon termination. At oral argument, Mason stated that any amounts owed under the Retention Agreement would be reduced by any amounts received under the Employment Agreement's termination provisions.

[4]The following day, the bankruptcy court ordered the cases to be jointly administered.

induced to remain with the company by the debtor in possession's postpetition promise that her two agreements "were in effect and would be honored." Mason also queried her counsel about the status of the two agreements; her counsel recommended that the debtor in possession seek formal bankruptcy court approval of the agreements. When Mason relayed her counsel's recommendation to the debtor in possession, she was allegedly told that both agreements had already been approved by them and that only the paperwork needed to be done before seeking court sanction.

In the meantime, the operations were quickly downsized: 35 of the 55 stores were closed shortly after the petition date, and in the wake of these closures, on November 9, 1999, Mason was notified that she was being put on "administrative leave," with pay, pending a motion to reject both agreements under 11 U.S.C. § 365. While the motion was under advisement, on February 2, 2000, the debtor in possession sold substantially all of its remaining assets to another corporation.

On February 25, 2000, the bankruptcy court granted the motion to reject the Employment Agreement but ruled that the Retention Agreement could not be rejected because that agreement was nonexecutory.[5] The court agreed with Mason that the "Retention

---

[5]"The Bankruptcy Code furnishes no express definition of an executory contract, see 11 U.S.C. § 365(a), but the legislative history to section 365(a) indicates that Congress intended the term to mean a contract 'on which performance is due to some extent on both sides.'" NLRB v. Bildisco & Bildisco, 465 U.S. 513, 522

Agreement [could not] be considered executory because she ha[d] no performance obligations thereunder." Neither party appealed these rulings. Four days later, on March 1, 2000, Mason was terminated.

Mason then filed a "Request for Payment of Chapter 11 Expense," in which she claimed that her termination benefits specified in both agreements, including legal fees and expenses, were entitled to first priority as administrative expenses under 11 U.S.C. §§ 507 and 503(b)(1) because she was terminated after rendering postpetition services and after a qualifying change in control had taken place during the reorganization. In addition, she maintained that because the debtor in possession induced her to continue working by promising to honor the two agreements, they were bound by the terms of those agreements. The appellees, the Official Committee of Unsecured Creditors (the "Committee") for the estate, opposed the request, and both parties filed motions for summary judgment.

In a thorough, well-written opinion, the bankruptcy court granted summary judgment in favor of the Committee on the ground that the consideration supporting the termination clauses--Mason's agreement to forgo her employment opportunities at Home Goods, Inc.--was supplied to the debtors when Mason signed the two agreements; consequently, she had only a general unsecured claim for damages not entitled to administrative priority. The court

_____

(1984) (quoting H.R. Rep. No. 95-595, p. 347 (1977)).

also rejected her inducement argument as "implausible" given Mason's distrust of the debtor in possession and her consultations with counsel about the status of the two agreements. Finally, the court held that the general unsecured claim under the Employment Agreement was subject to the one-year cap pursuant to 11 U.S.C. § 502(b)(7).[6] As for the Retention Agreement, the court held that Mason was entitled to benefits under the agreement since she was terminated subsequent to a qualifying change in control, but because the contract was nonexecutory, the rights springing from the agreement were prepetition general unsecured claims not entitled to administrative priority. Unlike the claim under the Employment Agreement, however, the claim was not subject to the one-year cap.[7] On appeal, the United States District Court for the District of Massachusetts affirmed on a different ground, holding that Mason had failed to show that her postpetition services were "necessary to preserve the estate" under 11 U.S.C. 503(b)(1).

---

[6]We agree with the Committee that Mason forfeited any right to appeal the court's ruling that the claim is subject to the one-year cap. The first place she mentions any challenge to the ruling is in the conclusion of her opening brief, where she makes a one-sentence statement that the statutory cap should not apply. It is axiomatic that a party forfeits a claim on appeal where she failed to raise it with some effort at developed argumentation in her opening brief, and instead raised it for the first time in her reply brief. R.I. Dep't of Env't Mgmt. v. United States, 304 F.3d 31, 47 n.6 (1st Cir. 2002); Anderson v. Beatrice Foods Co., 900 F.2d 388, 397 (1st Cir. 1990); see also Fed. R. App. P. 28(a)(6).

[7]The Committee did not appeal these rulings.

Our review of the district court's decision amounts to review of the bankruptcy court's decision in the first instance. Printy v. Dean Witter Reynolds, Inc., 110 F.3d 853, (1st Cir. 1997); Hope Furnace Assocs., Inc. v. FDIC, 71 F.3d 39, 42-43 (1st Cir. 1995). Because this case comes to us on a grant of summary judgment, we review the rulings de novo. Magarian v. Hawkins, 321 F.3d 235, 236 (1st Cir. 2003).

**A**

The paramount objective of a Chapter 11 reorganization is to rehabilitate and preserve the value of the financially distressed business. Bildisco, 465 U.S. at 528; Otte v. United States, 419 U.S. 43, 53 (1974). To accomplish this objective, subsection 507(a)(1) of the Bankruptcy Code, 11 U.S.C. § 507(a)(1), grants first priority in the distribution of the limited assets of the estate to administrative expenses allowed under section 503, 11 U.S.C. § 503, which include "the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case," 11 U.S.C. § 503(b)(1)(A). Congress recognized that granting first priority to administrative expenses would encourage creditors, otherwise wary of dealing with Chapter 11 businesses, to provide the goods and services required for successful rehabilitation. H.R. Rep. No. 595, 95th Cong., 1st Sess. 186, 186-

87 (1977); Cramer v. Mammoth Mart, Inc. (In re Mammoth Mart, Inc.), 536 F.2d 950, 954 (1st Cir. 1976). And since the estate's creditors who have pre-bankruptcy claims will presumably benefit more from rehabilitation than from liquidation, it is not surprising that those creditors bear the costs of the rehabilitation. Granting priority status, however, is contrary to the fundamental principle of bankruptcy law that the debtor's limited resources are to be distributed equally among similarly situated creditors, see H.R. Rep. No. 595, 95th Cong., 1st Sess. 186 (1977); thus, statutory priorities are narrowly construed, and the burden of proving entitlement rests with the party seeking it. In re Hemingway Transp., Inc., 954 F.2d 1, 5 (1st Cir. 1992).

**B**

In general, for a claim to qualify as an administrative expense under subsection 503(b)(1), (1) it must have arisen from a transaction with the trustee or debtor in possession, rather than from a prepetition transaction with the debtor, and (2) the consideration supporting the claim must have benefitted the estate in some demonstrable way. Id. at 5; Mammoth Mart, 536 F.2d at 954. Here, there was no postpetition agreement between Mason and the debtor in possession. As Mason stated, "it is undisputed that her postpetition services were rendered pursuant to her pre-petition employment agreement." In such circumstances, we need to explore

the interplay between subsection 503(b)(1) and the Code's treatment of executory contracts under 11 U.S.C. § 365.

Subsection 365(a) allows a debtor in possession[8], subject to the court's approval, to assume or to reject a prepetition executory contract. 11 U.S.C. § 365(a). The debtor in possession may make this decision at any time prior to the confirmation of the plan, unless the court orders otherwise upon request of the nondebtor contracting party. Id. § 365(d)(2). This latitude allows the debtor in possession an opportunity to determine which of the prepetition executory contracts are beneficial to the estate and which should be assumed or rejected. See Pub. Serv. Co. of N.H. v. N.H. Elec. Cooperative, Inc. (In re Pub. Serv. Co. of N.H.), 884 F.2d 11, 15-16 (1st Cir. 1989) (The Code "afford[s] breathing space to decide which contracts they wish to assume [or reject]"). If a debtor in possession assumes an executory contract under subsection 365(a), "it assumes the contract *cum onere*," and the liabilities incurred in performing the contract will be treated as administrative expenses. Bildisco, 465 U.S. at 531-32; see also In re Frontier Props., Inc. 979 F.2d 1358 (9th Cir. 1992). If the contract is rejected, on the other hand, the contract is deemed

---

[8]Pursuant to 11 U.S.C. § 1107(a), the Chapter 11 "debtor in possession shall have all the rights . . . and powers, and shall perform all the functions and duties, . . . of a trustee serving in a case under this chapter."

breached on the date "immediately before the date of the filing of the petition," 11 U.S.C. § 365(g)(1), and the nondebtor party has a prepetition general unsecured claim for breach of contract damages, one not entitled to administrative priority, 11 U.S.C. § 502(g). See Bildisco, 465 U.S. at 531; In re Stewart Foods, Inc. v. Stewart Foods, Inc. (In re Stewart Foods, Inc.), 64 F.3d 141, 144 (4th Cir. 1995). It should be evident that the decision to assume or reject has significant consequences and that "the authority to reject an executory contract is vital to the basic purpose to [sic] a Chapter 11 reorganization, because [it] can release the debtor's estate from burdensome obligations that can impede a successful reorganization." Bildisco, 465 U.S. at 528.

Where the debtor in possession, however, induces a nondebtor to render performance pursuant to an unassumed prepetition executory contract, pending its decision to reject or assume, the nondebtor party will be entitled to administrative priority only to the extent that the consideration supporting the claim was supplied to the debtor in possession during the reorganization and was beneficial to the estate. 11 U.S.C. § 503(b)(1); Mammoth Mart, 536 F.2d at 954; see also Bildisco, 465 U.S. at 531. The facts and holding of Mammoth Mart provide an apt illustration. The employees in that case sought administrative priority for their severance pay, which was based on length of service. The employees had been terminated by the debtor in

-10-

possession during the reorganization and had been paid their wages plus severance pay attributable to the services rendered after the filing date. Not happy with this outcome, the employees requested that the court order the debtor in possession to pay as an administrative expense all of their accrued severance, including severance that had been "earned" from rendering prepetition services. The court denied the employees' claim on the ground that the consideration supporting the claim for severance consisted of the prepetition services rendered for the debtor: "no part of their present claims [arose] from services performed for the debtor-in-possession . . . ." Mammoth Mart, 536 F.2d at 955. The rationale underlying the holding was that because severance pay was a component of compensation for services rendered--that is, the employees' wages included severance pay--it could be entitled to administrative priority, but only to the extent that it was earned postpetition. Furthermore, it made no difference that the right to payment for the severance earned prepetition arose during the reorganization. What did matter was when the consideration supporting the claim was supplied. Id. at 954; see also 11 U.S.C. § 503(b)(1) ("for services rendered after the commencement of the case") (emphasis added).

Contrary to Mason's assertion, the terms of the prepetition contract do not determine the amount of the priority--a question we left open in Mammoth Mart, 536 F.2d at 954 n.3--nor

does the contract become enforceable against the debtor in possession simply because it elects to receive benefits under the contract after the filing date.[9]  Although during the Chapter 11 proceeding a prepetition executory contract remains in effect and enforceable against the nondebtor party to the contract, the contract is <u>unenforceable</u> against the debtor in possession unless and until the contract is assumed.  <u>Bildisco</u>, 465 U.S. at 532 ("[F]rom the filing of a petition in bankruptcy until formal acceptance, the [executory contract] is not an enforceable contract [against the debtor in possession] . . . . and may never be enforceable again."); <u>United States ex rel. United States Postal Serv.</u> v. <u>Dewey Freight Sys., Inc.</u>, 31 F.3d 620, 624 (8th Cir. 1994) (citing <u>Bildisco</u>, 465 U.S. at 532 and other cases); <u>In re Univ. Med. Ctr.</u>, 973 F.2d 1065, 1075 (3d Cir. 1992); <u>In re Pub. Serv. Co. of N.H.</u>, 884 F.2d at 14-15; <u>see also</u> <u>In re Alongi</u>, 272 B.R. 148, 152 (Bankr. D. Md. 2001); <u>In re El Paso Refinery, L.P.</u>, 220 B.R. 37, 48 (Bankr. W.D. Tex. 1998).  As instructed by the Supreme Court in <u>Bildisco</u>,

---

[9]According to Mason, the debtor in possession here had two choices, either terminate her prior to filing for bankruptcy to avoid the specter of extraordinary postpetition liability or attempt to renegotiate the terms of her employment.  If negotiations ultimately failed, however, the debtor in possession would be stuck with the terms of Mason's agreement in toto once they elected to receive the benefits under that agreement.  If Mason's reasoning were to prevail, a debtor in possession would not, as a practical matter, be able to avail itself of the benefits of section 365.  Not surprising, this is not the law.

> If the debtor-in-possession elects to continue to receive benefits from the other party to an executory contract pending a decision to reject or assume the contract, the debtor-in-possession is obligated to pay <u>for the reasonable value of those services</u>, which, depending on the circumstances of a particular contract, may be what is specified in the contract.

465 U.S. at 531 (emphasis added) (citations omitted). Thus, under <u>Bildisco</u>, absent a court-approved assumption, from the date of the filing of the Chapter 11 proceeding, Mason's Employment Agreement was unenforceable against the debtor in possession despite their election to continue her employment; she is entitled to only the reasonable value of her postpetition services that benefitted the estate. Although the Employment Agreement may be probative of the reasonable value, it is not the dispositive measure.

We recognize that <u>Bildisco</u> addressed a particular type of executory contract, a collective bargaining agreement. Yet the Court did not limit its discussion to collective bargaining agreements, but instead discussed general principles of executory contract law. Further, in 1984, in response to <u>Bildisco</u>, Congress amended the Code by adding 11 U.S.C. § 1113, which provides special treatment for collective bargaining agreements. Bankruptcy Amendments and Federal Judgeship Act of 1984, sec. 541, § 1113, Pub. L. No. 98-353, 98 Stat. 333. Among other things, 11 U.S.C. 1113 overturned that part of <u>Bildisco</u> that allowed the trustee to make unilateral changes in the terms or conditions of a collective

-13-

bargaining agreement during reorganization. See United Food & Commercial Workers Union, Local 328, AFL-CIO v. Almac's Inc., 90 F.3d 1, 4 (1st Cir. 1996). However, Congress left intact Bildisco's discussion of the enforceability of garden variety executory contracts during Chapter 11 proceedings.

In the same Act, Congress also added subsection 365(d)(3), 11 U.S.C. § 365(d)(3), which requires a debtor in possession to "timely perform all the obligations of the debtor . . . arising . . . under any unexpired lease of nonresidential real property [during Chapter 11 proceedings], until such lease is assumed or rejected," and subsection 365(d)(4), 11 U.S.C. § 365(d)(4), which provides that if the debtor in possession fails to assume such a lease within 60 days, the "lease is deemed rejected." Bankruptcy Amendments and Federal Judgeship Act of 1984, sec. 362, §§ 365(d)(3), (d)(4), Pub. L. No. 98-353, 98 Stat. 333 (emphasis added). Thus, Congress eliminated the rule that landlords were entitled only to the reasonable value of the benefits bestowed upon the debtor in possession and forced the debtor in possession to decide whether to assume the lease within 60 days. Obviously then, when Congress thought that certain executory contracts were more deserving of special treatment, it said so. But no such specificity is provided for prepetition employment contracts. Congress's familiarity with Bildisco and its failure to provide special treatment to garden variety employment contracts indicates

-14-

that Congress intended that employment contracts be subject to the general principles governing executory contracts outlined in <u>Bildisco</u>.

**D**

To avoid the realities of the foregoing principles, Mason relies principally upon footnote 4 in <u>Mammoth Mart</u> to argue that there is, or should be, an exception where a debtor in possession induces the nondebtor party to continue to perform the prepetition contract by a promise to honor the terms of that contract. In such a case, the theory goes, both parties are bound by all of the terms of the contract, including, in this case, the contractual termination provisions. Although Mason's argument seems consistent with footnote 4 of <u>Mammoth Mart</u>[10] and may carry some equitable appeal, it runs directly contrary to not only the general principles governing executory contracts, <u>see</u> <u>supra</u> Part II.C, but also to the language of and policies served by section 365, and,

---

[10]We note that <u>Mammoth Mart</u> was a pre-Code case and relied, in part, upon a 1947 case, <u>In re Public Ledger, Inc.</u>, 161 F.2d 762 (3d Cir. 1947), which may explain the reason for the footnote. In <u>Public Ledger</u>, the Third Circuit held that where the trustee and employee continue "the employment upon the same terms as were provided in the collective contract, and therefore, while the employees were under the duty of delivering their services in accordance therewith, the employer was under the correlative duty of paying them in accordance therewith." Similarly, the <u>Public Ledger</u> court used other language to suggest that a debtor in possession could assume a contract by implication, without court approval, and thus be bound by all the terms of the prepetition contract. <u>See, e.g.</u>, <u>id.</u> at 767. For reasons that will soon become apparent, this is not the law under the Bankruptcy Code.

for that matter, to the goals of Chapter 11, which is the successful rehabilitation of the business for the benefit of both the debtor and all its creditors.

Mason's argument amounts to a claim that the debtor in possession assumed the Employment Agreement by implication. It is well settled, however, that an executory contract cannot be assumed by the unilateral acts of the debtor in possession during the reorganization of the business. Thinking Machs. Corp. v. Mellon Fin. Servs. Corp. (In re Thinking Machs. Corp.), 67 F.3d 1021, 1025 (1st Cir. 1995) (holding that court approval is a condition precedent); Dewey Freight Sys., Inc., 31 F.3d at 624; Matter of Whitcomb & Keller Mortgage Co., 715 F.2d 375 (7th Cir. 1983); In re Uly-Pak, Inc., 128 B.R. 763, 765 (Bankr. S.D. Ill. 1991). Rather, the plain text of section 365 requires express approval by the court. 11 U.S.C. § 365 ("[T]he trustee, subject to the court's approval, may assume or reject any executory contract . . . ."); see In re Thinking Machs. Corp., 67 F.3d at 1025. The policy served by court approval is not difficult to discern. As mentioned above, assumption of a prepetition contract has serious consequences: it not only elevates a prepetition liability to a postpetition liability, but also entitles the nondebtor party to first priority status. Court approval thus provides protection to the unsecured creditors whose claims could be prejudiced by

-16-

potentially burdensome contracts--ones that may have driven the business into bankruptcy in the first place.

It also insures that the Committee has an opportunity to object and that it is fully able to oversee the debtor in possession's operation of the business and the negotiation of the plan of reorganization. See 11 U.S.C. § 1103 (setting forth the functions of the appointed committee of unsecured creditors). This case illustrates the policy well. During the hearing on the motion to reject, the Committee explained that it supported the motion to reject on the ground that it was opposed to the assumption of any of the debtors' prepetition employment agreements, including Mason's, as they allegedly contained "extraordinary" severance packages that were "far in excess of anything that [it] normally s[aw] as customary." Regardless of the truth of the Committee's statement, the point is that the other unsecured creditors were given an opportunity to voice their objection before their rights to the limited assets of the estate could be prejudiced. In short, before a debtor in possession and a prepetition creditor can saddle the bankrupt estate with obligations contained in a prepetition executory contract, they must first receive court approval.[11] Here, of course, there was no court-sanctioned assumption; the debtor in possession rejected the contract with court approval.

---

[11]This should come as no surprise to Mason: her own counsel informed her soon after the petition date that she should seek court approval of both agreements.

In many instances, Chapter 11 proves to be a harsh reality for nondebtors like Mason, but achieving better policy is a task for Congress, not the courts. In any event, Mason did have a remedy: she could have petitioned the bankruptcy court, pursuant to 11 U.S.C. § 365(d)(2), to order the debtor in possession to assume or reject her Employment Agreement within a specified time. This she decided not to do.

## III

With these general principles in mind, we turn to Mason's claims, addressing the Employment Agreement first.

## A

Mason's principal argument is that her claim for severance is entitled to administrative priority because the consideration supporting her claim constituted "being an employee in good standing at the time of the discharge," which she supplied postpetition. In other words, the "reasonable value" of her being "in good standing" was an amount equal to in excess of $1.2 million plus other benefits including legal costs and expenses. If one takes Mason's argument to its logical terminus, an executive would be entitled to administrative priority for lump-sum severance pay, no matter how astronomical, simply by working one day for the debtor in possession so long as she was in "good standing at the time of discharge." For the reasons that follow, we cannot accept this conclusion.

We hold that the consideration supporting Mason's claim for severance benefits was not "being an employee in good standing at the time of the discharge," but rather her agreement to forgo other employment opportunities (in this case, her agreement to forgo her high-paying position at Home Goods, Inc.), which she provided prepetition to the debtor the moment she signed the Employment Agreement in May 1999. See In re Commercial Fin. Serv., Inc., 246 F.3d 1291, 1294 (10th Cir. 2001) (denying administrative priority to claim for lump-sum severance pay nearly identical to Mason's, on the ground that the consideration supporting the claim was the agreement to forgo other employment opportunities, which was supplied entirely at the time of the execution of the employment agreement); In re Phones for All, Inc., 249 B.R. 426, 430 (Bankr. N.D. Tex. 2000) (same), aff'd 288 F.3d 730 (5th Cir. 2002); see also In re Nomus-American, Inc., No. 01-50255 11, 2002 WL 230701, at *2 (Bankr. M.D. N.C. 2002) (same); In re M Group, Inc., 268 B.R. 896, 901 (Bankr. D. Del. 2001) (same); In re Cincinnati Cordage & Paper Co., 271 B.R. 264, 267-69 (Bankr. S.D. Ohio 2001) (same); In re Uly-Pack, 128 B.R. 763, 768 (Bankr. S.D. Ill. 1991) (same). Indeed, Mason stated that the severance provisions in her Employment Agreement and Retention Agreement were part of the inducement to leave her high-paying position at Home Goods. Unlike severance or vacation benefits geared to length of service--benefits that clearly constitute a part of an employee's

-19-

wages for services rendered, see, e.g., Mammoth Mart, 536 F.2d at 954-55[12]--the severance benefits here do not constitute any part of her compensation for services rendered. Whether she worked two minutes or thirty-five and one-half months after executing the Employment Agreement, she was entitled to in excess of $1.2 million if she were terminated without cause. In fact, by the literal terms of the agreement, it appears that she was entitled to over $1.2 million regardless of whether she rendered any services whatsoever. Her compensation for services rendered simply did not include severance pay. Cf. 11 U.S.C. § 503(b)(1) (granting priority to "wages, salaries, or commissions for services rendered after the commencement of the case.").

Mason relies primarily upon the following dictum in Mammoth Mart:

> If an [unrejected] employment contract provides that all discharged employees will receive severance pay equal to their salaries for a specified period, the consideration supporting the claim being an employee in good standing at the time of the discharge will

_____

[12]Where severance or vacation pay is geared to length of service, the pay is essentially additional wages. For example, suppose the employee earns two weeks (i.e. 10 days) severance or vacation for rendering services for a full calendar year; that would mean that she earned one day of severance or vacation for every twenty-six days worked. Clearly the severance or vacation is a component of her daily compensation for services rendered. Mammoth Mart, 536 F.2d at 954-55. Accordingly, the court in Mammoth Mart held that an employee under such a program was entitled to administrative priority for the severance "earned" for services rendered postpetition, but not for severance earned prepetition.

-20-

> have been supplied during the arrangement, and the former employee will be entitled to priority.

536 F.2d at 955. Although not binding on this court, we briefly address this passage.[13] To begin, it is not entirely clear what type of severance provision the Mammoth Mart court was contemplating when it discussed this hypothetical situation. We find it unlikely that it was referring to severance provisions in executive employment contracts, like the one here. See, e.g., Soma Biswas, Wachner Settles Warnaco Severance Fight, The Daily Deal, Nov. 19, 2002 (discussing Linda Wachner's $25 million severance payment she sought during Chapter 11 proceeding); Calvin Trillin, Deep Pocket, Short Reach, Time Mag., Jan. 13, 1997, at 24 (discussing Michael Ovitz's $90 million severance package). Because the court cited to In re Public Ledger, 161 F.2d at 769-71, we presume that it was referring to the severance plan at issue in that case, which was a plan that provided for severance pay in lieu of notice of termination. Under such a plan, the employer could either provide two days' notice, after which the employee would work two more days and be paid, or terminate the employee

---

[13]Both the bankruptcy and district courts rejected Mason's argument on the ground that when the court in Mammoth Mart made that comment, it was discussing the hypothetical situation in which severance pay was predicated on an "unrejected contract." Because Mason was terminated shortly after the rejection of the contract, the theory goes, she had only a prepetition general unsecured claim for damages. Because we hold that the consideration supporting her claim was supplied prepetition, we offer no opinion whether the timing of her termination is dispositive.

immediately and pay the employee two days' pay. Courts that have granted administrative priority to such severance pay arrangements have done so on the theory that severance in lieu of notice, like severance based on length of service, is a component of compensation. See, e.g., In re Pub. Ledger, Inc., 161 F.2d at 769-71; Teamsters Local No. 310 v. Ingrum (In re Tucson Yellow Cab Co.), 789 F.2d 701, 704 (9th Cir. 1986); see also In re Commercial Fin. Serv., 246 F.3d at 1296 (distinguishing severance pay in lieu of notice plans from one similar to Mason's on the ground that the former "was clearly a component of compensation"). As should now be clear, however, we hold that Mason's severance pay was not a component of compensation for services she rendered and thus is not entitled to administrative priority.[14]

Of course, Mason is entitled to receive the reasonable value of the beneficial services rendered during the reorganization. For these services, she was fully compensated by the debtor in possession: she received her full salary plus fringe benefits pursuant to the terms of her Employment Agreement for all the services she rendered postpetition.[15] Absent a court approved

---

[14]We offer no opinion on whether we would grant administrative priority to in lieu of notice plans.

[15]In fact, Mason might have received more than the reasonable value of the services she rendered as administrative expenses. At the hearing on the motion to reject, on December 22, 1999, the bankruptcy court instructed the debtor in possession to cease paying Mason her salary and benefits and to route those payments to an escrow account while the court took the motion under advisement.

assumption of her Employment Agreement, this was all she is entitled to receive.

**B**

Having determined that Mason's claim arising out of the Employment Agreement is not entitled to administrative priority, we turn to the Retention Agreement. The parties agree that the Retention Agreement is a nonexecutory contract because Mason owed no performance thereunder. The consideration supporting the Retention Agreement--to forgo other employment opportunities--was supplied the moment she signed the agreement. Only the right to payment arose after the petition date. Notwithstanding the foregoing principles, Mason asks us to grant administrative priority on the theory that nonexecutory contracts should be treated differently because they can be neither assumed nor rejected, and thus should be enforceable against the debtor's estate as an administrative expense.

Mason misses the point. While the claim under the Retention Agreement is enforceable against the estate in the bankruptcy proceeding, it is a prepetition claim. In re Stewart Foods, Inc., 64 F.3d at 144; In re Hemingway Transp., Inc., 954 F.2d at 8; 11 U.S.C. § 101(5)(A) (defining claim as "right to

_____

Apparently due to a "ministerial error," Mason continued to receive her full salary and benefits until February 15, 2000, even though she did not render any services to the estate during that period. The dispute over those payments is beyond the scope of this appeal.

-23-

payment, whether or not such right is . . . contingent, matured, [or] unmatured"). The contingent claim, however, is not entitled to priority simply because the right to payment arises during the reorganization when the contingency occurs. In re Commercial Fin. Serv., Inc., 246 F.3d at 1295; In re Stewart Foods, Inc., 64 F.3d at 144, 146 In re Hemingway Transp., Inc., 954 F.2d at 8; Mammoth Mart, 536 F.2d at 954; Jartran, 732 F.2d at 587; 11 U.S.C. § 503(b)(1) ("for services rendered after the commencement of the case") (emphasis added). Under a nonexecutory contract, in which the nondebtor owes no future performance, the nondebtor provides no consideration "after the commencement of the case," and thus is not entitled to priority. 11 U.S.C. § 503(b)(1)(A) (emphasis added); In re Stewart Foods, Inc., 64 F.3d at 145 ("[R]egardless of the nature of the contract, if at the time of the bankruptcy filing the debtor has an obligation under the contract to pay money to the non-debtor party, that obligation is handled as a pre-petition claim in the bankruptcy proceedings."). We hold, therefore, that Mason's claim under the Retention Agreement is not entitled to administrative priority.

**IV**

Having determined that the consideration supporting Mason's claims under the Employment Agreement and the Retention Agreement was provided to the debtors prior "to the commencement of the [Chapter 11 proceedings]," 11 U.S.C. § 503(b)(1)(A), we hold

-24-

that her claims are not entitled to administrative priority.[16]

Accordingly, the grant of summary judgment must be affirmed.

---

[16]Again, we recognize that Congress's balancing of the equities in Chapter 11 in favor of reorganization and equality of distribution of the limited assets to all unsecured creditors, see supra Part II, may be a harsh reality for the individual nondebtor like Mason, who is a party to a prepetition executory contract with the debtor. But Congress provided a remedy: Mason could have petitioned the bankruptcy court under subsection 365(d)(2), 11 U.S.C. § 365(d)(2), to order the debtor in possession either to assume or reject her Employment Agreement within a specified time, a remedy of which she chose not to pursue.