**In re COMPUTER ENGINEERING ASSOCIATES, INC., Debtor,**

**Advanced Testing Technologies, Inc. Plaintiff, Appellee,**

v.

**John O. Desmond, Defendant, Appellant.**

No. 02–1470.

United States Court of Appeals, First Circuit.

Heard April 9, 2003.

Decided July 24, 2003.

perfunctorily without any developed argument are deemed waived on appeal).

Kenneth A. Martin, with whom Martin & Associates, and John O. Desmond, were on brief for appellant.

William J. Barrett, with whom Barack Ferrazzano Kirschbaum Perlman & Nagelberg LLC, were on brief for appellee.

Before SELYA, Circuit Judge, STAHL, Senior Circuit Judge, and LIPEZ, Circuit Judge.

STAHL, Senior Circuit Judge.

In this appeal, the Chapter 7 trustee seeks to avoid, as preferential transfers under 11 U.S.C. § 547(b), payments received by the debtor's subcontractor within the 90–day period preceding the debtor's filing for bankruptcy. The bankruptcy court ruled in favor of the trustee; the district court reversed. The trustee now appeals the district court's ruling. We hold that the transfers to the subcontractor occurred before the preference period and therefore affirm the district court's reversal of the bankruptcy court's decision.

## I

In July 1990, Computer Engineering Associates, Inc. ("CEA"), a Massachusetts corporation that provided hardware and software support and enhancement for computer systems, entered into an open-ended contract (the "Kelly Contract") with the United States Air Force ("USAF") to provide engineering services. Pursuant to the Contract, USAF issued delivery orders to CEA for engineering services, either relating to a new project or a continuation of a previous delivery order. Between August 1, 1994 and September 29, 1994, CEA received seven delivery orders (48, 49, 50, 51, 52, 53, and 55), under which CEA was to receive a fixed price of $2,850,111.53.

CEA subcontracted the seven delivery orders to Advanced Testing Technologies, Inc. ("ATTI"), a New York corporation, "for a fixed price of $2,375,092.95 or 20% less than the amount the government had agreed to pay it." *Computer Eng'g Assoc., Inc. v. Desmond (In re Computer Eng'g Assoc., Inc. I)*, 252 B.R. 253, 261 (Bankr. D.Mass.2000).[1] The decision to subcon-

1. CEA subcontracted to ATTI at least five    other delivery orders under the Kelly Con-

tract these particular delivery orders was made because CEA was unable to complete them without ATTI and its proprietary Benchtop Reconfigurable Automatic Tester ("BRAT"). In fact, according to a former CEA employee, whose testimony was credited by the bankruptcy court, there was a risk that CEA would lose the job to ATTI; as a consequence, CEA decided to subcontract to ATTI as it was better to "get the 20 percent cut versus nothing." *Id.* at 261. In addition to performing the work, ATTI prepared the monthly reports that CEA was required to prepare and submit to the USAF.

The delivery orders entitled CEA to receive monthly progress payments upon CEA's submission of a "Contractor's Request for Partial Payment," which, if it included any of ATTI's charges, could not be submitted "unless CEA had received an invoice from ATTI for the period for which CEA was seeking partial payment." *Id.* at 262. Each subcontract with ATTI provided that, once CEA received a government payment, it had ten days to remit payment to ATTI.

In early 1995, CEA's financial condition began to deteriorate. It defaulted on various contracts, failed to pay its creditors, employees, and payroll taxes, and closed some of its offices. Employees also started to leave due to CEA's failure to meet payroll. Despite receiving payments from the government for work performed by

ATTI, CEA ceased paying ATTI. Indeed, by April 30, 1995, several of ATTI's invoices were over 120 days in arrears. CEA offered ATTI several excuses for the nonpayment, including that it had not received payment from the government. ATTI soon learned that CEA, in fact, had been paid and that CEA previously had assigned its accounts receivables under the Kelly Contract to Fleet Bank.[2] Although as a defensive measure ATTI stopped submitting invoices and preparing monthly status reports, it continued to complete the delivery orders on schedule.

At this juncture, "there was important work remaining to be done on the [delivery orders]." *Id.* at 270. The bankruptcy court found that "CEA was not in a position to complete performance under the Contract and, absent the completion of performance by ATTI, would have defaulted on its contractual obligations to the government, would have received no further payments pursuant to the Contract, and, in all likelihood, would have been liable for damages for breach of contract." *Id.* The court based this finding, in part, on expert testimony that CEA did not have the technical abilities to complete the work, and other testimony that CEA was not in a financial position which gave it the ability to pay ATTI for its services or to employ other engineers and obtain a BRAT necessary to complete performance.[3] Given CEA's default with respect

tract. The bankruptcy court stated that it considered only the seven delivery orders since the parties had failed to submit any evidence as to the amount CEA and ATTI were entitled to receive under other delivery orders. *In re Computer Eng'g Assoc., Inc. I,* 252 B.R. at 261 n. 10.

2. In April 1994, CEA assigned to Fleet Bank, with which it had a line of credit, its accounts receivables under the Kelly Contract pursuant to the Assignment of Claims Act, 31 U.S.C. § 3727, and Anti–Assignment Act, 41 U.S.C.

§ 15. In 1995, CEA switched to First Trade Union Savings Bank ("FTU") as its primary lender, which satisfied CEA's obligations to Fleet, extended loans to CEA, and filed a UCC financing statement against CEA's assets, including its accounts receivables and contract rights. FTU was a coplaintiff and coappellee with the trustee in the proceedings below but is not a party to this appeal.

3. Although the trustee's expert testified that CEA could have hired other engineers to complete the delivery orders, he "admitted that

to the subcontracts with ATTI and its inability to complete performance without ATTI, the bankruptcy court found that "the Kelly Air Force Base Contract had no value to CEA ... unless ATTI agreed to complete performance." *Id.* at 281.

Rather than refusing to deliver the work it had completed or to complete the delivery orders, ATTI attempted to salvage the relationship. In a letter, dated May 25, 1995, ATTI advised CEA that, due to the outstanding invoices and the assignment to Fleet, it would not "process any further invoices to [CEA]" unless some solution was reached. The letter proposed an arrangement that would purportedly (1) provide CEA with immediate financial relief in the form of a loan from State Bank of Long Island ("SBLI")[4] in an amount equal to CEA's 20% portion of the delivery orders and (2) guarantee ATTI its share by CEA's agreement to assign the Kelly Contract accounts receivables to SBLI, which, in turn, would "disburse to ATTI its portion and retain the CEA portion as payment on the loan outstanding." To accomplish this, ATTI proposed that CEA assign the Kelly Contract proceeds to its bank, SBLI, on the belief that the Assignment of Claims Act, 31 U.S.C. § 3727, and Anti-Assignment Act, 41 U.S.C. § 15, (collectively, the "Assignment of Claims Acts") prohibited the assignment of the Kelly Contract except to a qualified financing institution. *See, e.g.,* 41 U.S.C. § 15 ("No contract ... or any interest therein[ ] shall

be transferred ..., and any such transfer shall cause the annulment of the contract ... so far as the United States is concerned. [This provision] shall not apply in any case in which the moneys due or to become due from the United States ... are assigned to a bank, trust company, or other financing institution...."). The letter further stated that the proposed assignment would be "an irrevocable transaction on the part of CEA and CEA would agree not to prepay or remove such assignment from [SBLI] until all delivery orders that ATTI was a part of ha[d] been finalized." Finally, the letter informed CEA that ATTI had prepared the documents necessary to carry out the proposed agreement. To secure ATTI's performance and realize its 20% on the Contract, CEA agreed to the proposal.

There was one hitch: based on CEA's credit, SBLI would not loan CEA even $10,000 without additional collateral from ATTI. This was a problem because ATTI believed that a loan was necessary to perfect and maintain the assignment under the Assignment of Claims Acts. To secure the loan, Hector Gavilla and Eli Levi, president and executive vice president of ATTI respectively, provided personal guarantees and pledged their own certificates of deposits worth $10,000 to secure the bank's $10,000 loan to CEA.[5]

On or about June 21, 1995, CEA and ATTI executed an agreement, drafted by

---

his opinion as to CEA's ability to complete performance was predicated upon ATTI delivering to CEA the engineering work for which it had not been paid," and that CEA would need access to a BRAT. *In re Computer Eng'g Assoc., Inc. I,* 252 B.R. at 270. The court noted, however, that CEA "submitted no evidence that ATTI, upon CEA's default, would deliver to CEA the work that it had performed to date or that it would permit CEA to use a BRAT to complete the Contract." *Id.* at 269.

4. SBLI was ATTI's lending institution, had a perfected security interest in ATTI's accounts receivables, including the receivables owed by CEA under the delivery orders, and had advanced monies to ATTI using the CEA receivables as collateral.

5. Of course, in order to assign its payment right to SBLI, CEA first had to terminate the assignment held by Fleet, *see supra* note 2 and accompanying text, which it did on June 23, 1995.

ATTI, along the lines proposed in the May letter. Among other things, CEA agreed (1) to assign all proceeds under the Kelly Contract to SBLI pursuant to the Assignment of Claims Acts, (2) to establish a joint checking account with ATTI at SBLI, into which SBLI would deposit the Contract proceeds and from which ATTI and CEA would withdraw their respective shares on joint checks, (3) to apply for a loan from SBLI for $10,000, and (4) not to prepay the $10,000 loan. Moreover, CEA agreed that ATTI would prepare "each and every invoice, Contractor's Request for Progress Payment, DD250 or other request for payment ("invoice")," [6] ATTI would have full access to CEA's COINS System, through which ATTI could monitor CEA's invoices as processed by the government, and that "[a]ll amounts due to ATTI ... shall be paid from the first available proceeds held in the Account and CEA's share of such proceeds shall be reduced to compensate ATTI for such amount." [7] Finally, the agreement provided that it would be governed by New York law.

In addition, CEA and ATTI executed a "Corporate Resolution and Banking Agreement," an "Assignment of Deposit Account," and an "Indemnity Agreement," to which SBLI was also a party.[8] CEA also authorized and instructed SBLI in writing "to provide [ATTI] ... copies of all notices and actions concerning the CEA loan account with [SBLI] and authorize ATTI to make inquiries and to receive information concerning the loan." Within the next few days, CEA assigned its accounts receivables under the Kelly Contract to SBLI,[9] executed a promissory note in favor of SBLI in the amount of $10,000 and a "Commercial Security Agreement" that granted a security interest to SBLI, and established a joint corporate checking account with ATTI at SBLI. The assignment itself to SBLI provided specifically that "CEA agrees to an irrevocable assignment until contract completion."

Between September 15, 1995, and November 24, 1995, SBLI deposited into the joint account $1,447,068.45, representing the amount paid by the government for the delivery orders. Thereafter, ATTI and CEA, using the joint checks, withdrew their respective shares, $1,241,511.07 and $205,557.38 respectively.[10] The bankrupt-

---

**6.** Each invoice was to identify "the amount to be paid by the Government to CEA, and the division of such proceeds between CEA and ATTI" and to be "accompanied by a first check payable to ATTI to be drawn off the Account in the amount of the share of the proceeds due to be paid to ATTI and a second check payable to CEA to be drawn off the Account in the amount of the share of the proceeds due to be paid to CEA." After CEA reviewed the invoice and signed both checks, it was required to return them to ATTI, which in turn was required to submit the invoice to the USAF and sign and return the second check payable to CEA.

**7.** The agreement also granted ATTI a power of attorney "to do such acts and execute such documents in order to (i) submit invoices to the U.S. Government without approval of CEA; and (ii) sign checks on behalf of CEA" in the event of bankruptcy.

**8.** Under the Indemnity Agreement, CEA and ATTI agreed to indemnify SBLI for all claims arising out of the June transactions.

**9.** The USAF accepted the assignment on July 19, 1995.

**10.** We note that some of the numbers in this case do not seem to square. For example, the bankruptcy court found that, as of April 30, 1995, ATTI's balance on all of the delivery orders, including the five that the bankruptcy court stated that it was not considering, equaled $1,182,039.61, yet ATTI received $1,241,511.07. In any event, neither party disputes that $1,241,511.07 represents the amount that ATTI should have received and did receive for the work it rendered under the delivery orders.

cy court found that "[i]n view of CEA['s] financial difficulties and inability to perform the Contract without ATTI, the resolution advanced by ATTI enabled CEA to obtain $205,557.38, monies that would have been lost to it without the Assignment and ATTI's agreement to complete performance under the subcontract." *In re Computer Eng'g Assoc., Inc. I,* 252 B.R. at 281–82.

ATTI's stopgap measure, however, was not enough to prevent CEA's slide into bankruptcy. On November 24, 1995, CEA filed for Chapter 11 protection, and, in April 1997, converted the case to a Chapter 7 liquidation. The trustee sought to avoid the $1,241,511.07 received by ATTI during the 90–day period preceding CEA's filing on the ground that the assignment was to SBLI, not to ATTI, and thus CEA retained all right, title, and interest to any amounts in excess of that necessary to discharge the loan. ATTI disagreed on the ground that the June assignment was, in fact, an absolute assignment to ATTI through SBLI, which served as a necessary conduit due to the provisions of the Assignment of Claims Acts. Because the assignment occurred outside the preference period, the proceeds never became part of CEA's estate.

After a three-day bench trial, the bankruptcy court held that the $1,241,511.07 in withdrawals were preferences and avoidable by the trustee. In addition, the court found that ATTI had failed to meet its burden of proving any of the defenses enumerated in subsection 547(c) of the Code, 11 U.S.C. § 547(c), noting that ATTI had instead "relied on the Assignment of Claim to argue that CEA conveyed all its interests in the joint account to ATTI outside the preference period." *In re Computer Eng'g Assoc., Inc. I,* 252 B.R. at 271 n. 24. ATTI appealed to the federal district court for the District of Massachu-

setts the bankruptcy court's ruling that the transfers constituted preferences, but did not appeal the ruling that it had failed to prove any of the subsection 547(c) defenses. The district court reversed on the ground that CEA had divested itself of all interest in the Kelly Contract proceeds at the time it assigned the account to SBLI, an act occurring outside of the preference period. Notwithstanding this ruling, the court remanded the case to the bankruptcy court for a determination of whether any of the subsection 547(c) defenses applied.

## II

On August 28, 2002, because the district court reversed a "final" bankruptcy order and remanded the case, we ordered the parties to address this court's jurisdiction, absent Rule 54(b) certification, *see* Fed.R.Civ.P. 54(b). We now answer the jurisdictional question in the affirmative. Pursuant to 28 U.S.C. § 158(d), our jurisdiction is limited to "appeals from all final decisions, judgments, orders, and decrees entered" by the district court exercising its appellate jurisdiction over a bankruptcy court decision. *See, e.g., In re Gould & Eberhardt Gear Mach. Corp.,* 852 F.2d 26, 29 (1st Cir.1988). We have explained that an appellate court lacks jurisdiction "when a district court remands a matter to the bankruptcy court for 'significant further proceedings,' [as] there is no final order for purposes of § 158(d)." *Id.; compare id.* ("When a remand leaves only ministerial proceedings, for example, computation of amounts according to established formulae, then the remand may be considered final."). We agree with the parties that the remand here was superfluous and thus find that the district court's order is "final" for purposes of appellate review.

The ostensible purpose of the remand was for a determination of whether any of the subsection 547(c) defenses applied to

the transfers made to ATTI. However, the district court's ruling that none of the transfers were avoidable under subsection 547(b) rendered moot the issue of whether an exception to the trustee's avoidance power existed under subsection 547(c). Subsection 547(c) simply excepts certain transfers from avoidance that otherwise would be avoidable under 547(b). Moreover, as ATTI conceded, ATTI forfeited its right to appeal the bankruptcy court's determination by failing to raise it on appeal to the district court. For these reasons, we find the direction for a remand to be a nullity and the district court's order to be final; therefore, we have jurisdiction.

### III

■ Our review of the district court's decision amounts to review of the bankruptcy court's decision in the first instance. *In re FBI Distribution Corp.*, 330 F.3d 36, 41 (1st Cir.2003). We review the bankruptcy court's rulings of law de novo, findings of fact for clear error, and mixed questions somewhere on a sliding scale between de novo and clear error review depending on how fact dominated the question. *In re Spadoni*, 316 F.3d 56, 58 (1st Cir.2003); *In re Extradition of Howard*, 996 F.2d 1320, 1327–28 (1st Cir.1993); *In re LaRoche*, 969 F.2d 1299, 1301 (1st Cir.1992).

### A

■ In general, a Chapter 7 trustee, subject to the defenses set out in subsec-

tion 547(c), "may avoid any transfer of an interest of the debtor in property" made (1) to a creditor, (2) on account of an antecedent debt, (3) while the debtor was insolvent, (4) during the 90–day period preceding the filing of the petition, which (5) allowed such creditor to receive more than it would have under Chapter 7. 11 U.S.C. § 547(b). A transfer of the debtor's property is perfected for subsection 547(b) purposes "when a creditor on a simple contract cannot acquire a judicial lien that is superior to the interest of the transferee." *Id.* § 547(e)(1)(B). The determination of whether a judicial lien is superior to the interests of the transferee is governed by state law. *In re Battery One–Stop Ltd.*, 36 F.3d 493, 495 (6th Cir. 1994). The burden is on the trustee to prove each of these elements, and the failure to do so will defeat its preference claim. 11 U.S.C. § 547(g).

### B

■ The parties focus exclusively on whether the transfer to ATTI was perfected at the time of the assignment, which occurred outside the preference period. ATTI's theory is that the June 1995 transactions taken as a whole constituted an absolute assignment of the Kelly Contract proceeds directly to ATTI through SBLI, which it believed to be a necessary party due to the Assignment of Claims Acts.[11] In other words, CEA assigned to SBLI all its

---

11. In general, under the Assignment of Claims Acts, absent waiver by the government, *see D & H Distrib. Co. v. United States,* 102 F.3d 542, 546 (Fed.Cir.1996) (discussing waiver), the assignment of a government contract must be to a financing institution in order to be enforceable against the government. *See, e.g., Bank of America Nat'l Trust & Sav. Ass'n v. United States,* 23 F.3d 380, 384 (Fed.Cir.1994) (qualified assignee under the Assignment of Claims Acts has right to sue the

government for nonpayment). The bankruptcy court held that the Acts had no bearing in this case because the Acts were intended only "for the protection of the government and only the United States may assert [defenses thereunder]." *In re Computer Eng'g Assoc., Inc. I,* 252 B.R. at 282 n. 32 (citing *United States v. Certain Space in the Property Known as Chimes Bldg.,* 320 F.Supp. 491 (N.D.N.Y. 1969), *aff'd* 435 F.2d 872 (2d Cir.1970)); *see also In re Freeman,* 489 F.2d 431 (9th Cir.

interests in the accounts receivables and, at the same time, assigned to ATTI the amounts exceeding that necessary to satisfy the loan to SBLI, and retained an interest only in any surplus that remained after SBLI and ATTI received their assigned shares. Like any garden variety assignment, the assignment divested CEA of all rights, title, and interest, legal and equitable, to the proceeds and vested them in SBLI and ATTI. The trustee disagrees and argues that CEA never assigned to ATTI the proceeds in excess of the loan amount from SBLI; by contrast, CEA agreed only to "a procedure for the disbursement of funds," as evidenced by CEA's retention of control to direct SBLI where to deposit the monies. The trustee contends that, given CEA's authority to instruct SBLI where to deposit the funds, ATTI had no interest in the proceeds "until such time as funds were deposited into the joint account," and therefore the "transfers to ATTI occurred each time SBLI deposited funds into the joint account."

▮▮▮▮ To be an effective assignment, the assignor must divest itself of all right, interest, and control in the property assigned.[12] *Miller v. Wells Fargo Bank Int'l Corp.*, 540 F.2d 548, 557–58 (2d Cir.1976).[13]

Any act or words that show an intention to transfer all interests to the assignee are sufficient for a valid assignment; in other words, no specific or magic words are necessary for its formation. *Malone v. Bolstein*, 151 F.Supp. at 547; *Advance Trading Corp. v. Nydegger & Co.*, 127 N.Y.S.2d 800, 801 (N.Y.Sup.Ct.1953); *Kagan v. Wattendorf & Co.*, 294 Mass. 588, 3 N.E.2d 275, 279 (1936). Partial assignments—i.e., an assignment of only part of a larger interest in property (e.g., assignment of 80% of accounts receivables)—are valid and enforceable. *Hauser v. Western Group Nurseries, Inc.*, 767 F.Supp. 475, 485 n. 17 (S.D.N.Y.1991) (collecting cases); *Kagan*, 3 N.E.2d at 279; *NY Jur.2d Assignments* § 56 (2003) (collecting New York cases); Restatement (Second) of Contracts § 326 (1981). As the trustee points out, however, a mere promise to pay a debt out of a designated fund does not operate as an effective assignment where the assignor continues to control the fund; retention of control precludes the perfection of an assignment. *Miller*, 540 F.2d at 558; *Malone*, 151 F.Supp. at 547. Accordingly, our analysis centers on the parties' intent in entering the June 1995 transactions and whether and to what extent CEA retained control over the Contract proceeds.

1973) (an assignment not complying with the Assignment of Claims Acts is good against a trustee in bankruptcy even though the government had not yet paid the assignor.); *Matter of Topgallant Lines, Inc.*, 125 B.R. 682, 687–92 (Bkrtcy.S.D.Ga.1991). The trustee did not claim that the Acts prohibited the arrangement set up by ATTI.

**12.** As in the proceedings below, neither party advises us as to which state law applies to determine the validity of the assignment. We find the law of assignments in New York and Massachusetts not to be materially different and will cite to both.

**13.** In New York and Massachusetts the right to recover payments of money due or to become due under an existing executory contract, even though conditioned upon future performance, is a present assignable interest. *See, e.g., Malone v. Bolstein*, 151 F.Supp. 544, 547–49 (N.D.N.Y.1957) (interpreting New York law); *Scarborough v. Berkshire Fine Spinning Assoc.*, 128 F.Supp. 948 (S.D.N.Y. 1955); *Claycraft Co. v. John Bowen Co.*, 287 Mass. 255, 191 N.E. 403, 404 (1934); *see also* Restatement (Second) of Contracts § 320 illus. 5 (1981) ("A, a builder, and B, an owner of land, enter into a building contract. A assigns to C payments due or to become due him under the contract. The assignment is effective."); 14 *Mass. Prac. Summary Of Basic Law* § 7.123 (3d ed.1996); 6A *C.J.S., Assignments* § 19 (2003).

The evidence presented to the bankruptcy court, primarily the June agreements, the assignment to SBLI, the May 1995 letter, the parties' course of performance, and the testimony describing the events before and after the execution of the assignment convince us that CEA effected a partial assignment to ATTI, through SBLI, of CEA's interests in the accounts receivables necessary to pay off ATTI; in other words, CEA assigned to ATTI the amounts exceeding that necessary to satisfy the $10,000 loan and retained only an interest in any surplus—here, $205,557.38.[14] ATTI's arrangement was structured *"to divest* CEA of its ability to obtain the proceeds of the Contract and use them for its own benefit without first paying sums due and owing ATTI under the subcontract."[15] *In re Computer Eng'g Assoc., Inc. I,* 252 B.R. at 285 (emphasis added). Contrary to the argument pressed by the trustee, the agreement with ATTI was no mere promise to pay ATTI out of a designated fund. Rather, CEA relinquished all control over the proceeds to ATTI by (1) entering the June 1995 Agreement and the "irrevocable assignment" with SBLI; (2) establishing a joint bank account; (3) transferring to ATTI responsibility for preparing the invoices, and Contractor's Request for Progress Payment; (4) providing ATTI with full access to its COINS system; and (5) instructing SBLI to provide ATTI with copies of all notices and actions concerning the loan account and authorization to make inquiries. The record supports ATTI's contention that the transaction was intended to be an irrevocable transaction to divest CEA of its ability to receive the proceeds directly from the government and to do with the proceeds what CEA pleased. In sum, after entering the transactions with ATTI, CEA relinquished the right to collect and control the accounts and apply them as it saw fit—for example, to pay any of its other creditors—and transferred that right to ATTI to ensure, as the bankruptcy court found, that ATTI would complete the delivery orders and deliver the work to the government.

The events leading up to the assignment to ATTI further convince us that CEA intended to divest itself of its interest in the proceeds and to convey that interest to

---

**14.** It is not clear whether the bankruptcy court applied the correct legal standard to determine whether CEA had transferred to ATTI all its interests and control by virtue of the June 1995 agreements. Even though ATTI specifically argued below that CEA had assigned to ATTI the proceeds exceeding that necessary to pay off SBLI and cited to case law setting out the rules for absolute assignment, the bankruptcy court did not specifically reference assignment law in considering the preference claim. Nevertheless, the bulk of the court's analysis appears to have been focused on whether the parties intended an absolute assignment to ATTI and whether CEA relinquished sufficient control to perfect such an assignment. Even assuming that the bankruptcy court applied the wrong rule of law, we do not think that remand is necessary to permit that court to apply the correct legal standard. As we have said, where the trier of fact has made explicit and supportable findings of fact but applied the wrong legal standard, an appellate court may avoid a remand by arraying those findings along the proper legal continuum. *See Societe Des Produits Nestle, S.A. v. Casa Helvetia, Inc.,* 982 F.2d 633, 642 (1st Cir.1992). Here, the bankruptcy court made specific findings as to the intent of the parties in entering the arrangement and the effect of that arrangement, findings necessary to determine whether CEA had assigned its interests to ATTI. Given the court's findings, we find that nothing would be gained by remanding the case for further proceedings.

**15.** The trustee agreed in his brief that the transaction was "designed to deprive CEA of an opportunity to obtain and apply contract proceeds to its own use without having first paid ATTI the amounts owed it for its subcontract performance."

ATTI. It was CEA's default on the subcontracts with ATTI and its assignment to Fleet of the proceeds, which included payments derived from ATTI's performance, that prompted ATTI to insist upon the assignment. CEA was then over 120 days in arrears on some of ATTI's invoices, despite receiving payments from the government for ATTI's work. Rather than not delivering the work or demanding cash up front, ATTI instead required that CEA assign to ATTI its rights to the proceeds for the work performed by ATTI. Because CEA had neither the technical nor financial abilities to complete the delivery orders, and would have defaulted on the prime contract with the government and received nothing, CEA agreed to make the assignment in order to save its 20% profit. Once ATTI was ensured payment for its work, ATTI submitted invoices for its ongoing work, completed the delivery orders, and delivered the work under the delivery orders to the government; as a result, CEA received $205,557.38. As the parties intended, the effect of the agreements was to guarantee that CEA would not default on the prime contract and would receive a 20% override on ATTI's work and, at the same time, to ensure that ATTI would be paid for all of its work on the Contract.

The trustee's central challenge to ATTI's theory is that the agreement between CEA and ATTI was simply a promise to pay a debt out of a designated fund on the ground that CEA retained the theoretical authority to instruct SBLI to deposit the funds wherever CEA pleased; therefore, "the funds, when received by SBLI, prior to disbursement into the joint account, were available for distribution to CEA's general creditors." [16] Like the bankruptcy court, we think that the trustee oversimplifies what actually transpired. The record more than adequately supports the bankruptcy court's finding that

> [v]iewing the transaction ... as [a] whole, ... CEA and ATTI, in effect, created a vehicle for the benefit of ATTI and the secondary benefit of CEA. As part of the consideration for obtaining its share of the Contract proceeds, CEA executed the Assignment of Claim which ensured that the Contract proceeds essentially would be funneled through SBLI for the benefit of ATTI and indirectly for the benefit of CEA.

*Id.* at 282. Considering the agreements and the surrounding circumstances, we agree with the bankruptcy court that "SBLI was a mere conduit with respect to the Contract proceeds," *id.* at 283, and

**16.** The trustee does not contend that the joint signature requirement or the joint checking account has any relevance in this case—i.e., he does not claim that CEA retained the legal or equitable authority to refuse to sign the joint checks, by virtue of which a judicial lien creditor under state law could defeat ATTI's rights in the account. Instead, the trustee focuses the appeal on CEA's alleged authority to direct SBLI to deposit the proceeds in other accounts before the funds were deposited in the joint account. This is no surprise given that there is no indication in the record and no case law cited for the proposition that the signature requirement did anything more than provide CEA a purely ministerial role in the disbursement of the proceeds. Even a generous review of the record leads to the conclusion that the joint check agreement, which required that CEA sign the check before ATTI's submission of an invoice, was for ATTI's protection by ensuring that CEA did not interfere with ATTI's share of the Kelly Contract proceeds and proceeds from its other contracts (e.g., proceeds from the STARS Contract under which ATTI was the contractor and CEA the subcontractor also were deposited into the joint account). At the same time, it permitted CEA to monitor its own funds that were derived from other delivery orders not subcontracted to ATTI. In the context of the entire 1995 arrangement, the requirement, which was proposed by ATTI, gave CEA no effective control over the application of the Kelly Contract proceeds.

"was obligated to deposit the monies into the joint account," *id.* at 285. Not only did the various agreements reference the deposit procedure to be followed by SBLI,[17] but SBLI did deposit all amounts in the joint account without any further direction from CEA. At trial, Michael Sabala for SBLI testified that SBLI "deposited every check that came into the bank ... for CEA and ATTI pursuant to that contract into the joint checking account *as per our agreements.*" All of the parties understood that SBLI was required to deposit the funds into the joint account. The trustee simply has failed to point to anything in the record to refute the bankruptcy court's finding.

The trustee also makes two other arguments, although admittedly without much effort. First, despite conceding that the transactions were "designed to deprive CEA of an opportunity to obtain and apply contract proceeds to its own use without having first paid ATTI the amounts owed it for its subcontract performance," the trustee contends that the assignment to SBLI was intended solely as security for the $10,000 loan and that SBLI merely allowed ATTI and CEA to open a joint checking account. As the bankruptcy court found, this ignores the intent of the parties and what actually transpired. No matter how one reads the record, there is no escaping the fact that the purpose of the June 1995 transactions was to provide protection for ATTI by an assignment of CEA's interests to ATTI through SBLI, not to secure a $10,000 loan. The record reflects that SBLI was brought into the picture because ATTI believed that it could obtain an assignment of the proceeds only if it did so through a financing institution because of the requirements of the Assignment of Claims Acts. The loan itself was a means to carry out the parties' intent in entering the June 1995 transactions: Levi testified at his deposition that the sole purpose of the loan was to effect a valid Assignment of Claims. The trustee did not dispute this below and, in fact, agreed with this characterization. In his post-trial brief in the bankruptcy court proceedings, the trustee cited to evidence in the record to support this exact factual assertion.[18] The trustee now asks us to look at the assignment to SBLI in isolation and to ignore the other agreements and testimony that expose the true purpose of the assignment. We decline the invitation. In short, like the bankruptcy court, we find the trustee's argument totally lacking any factual support.

Finally, the trustee, in one sentence and without citation, maintains that CEA theoretically retained the authority to revoke the assignment by prepaying the loan. The record contradicts this claim, which undoubtedly explains why the trustee made no attempt to support the theory. *Cf. In re FBI Distribution Corp.*, 330 F.3d at 41 n. 6 (holding that a party who fails to raise an issue on appeal without some ef-

---

**17.** For example, the Indemnification Agreement executed by CEA, ATTI, and SBLI provides that "CEA, ATTI and [SBLI] intend to establish an account (the "Account") into which all proceeds of the Contract will be deposited ...."

**18.** The trustee stated that "ATTI understood that it could not execute an Assignment of Claims directly with CEA, because the Assignment of Claims Act, (the "Act"), limits assignment only to financial institutions providing financing for performance of government contracts." Moreover, the trustee stated that "ATTI also understood that a loan of some amount was necessary to effectuate any assignment under the Act." Therefore, "ATTI approached SBLI to provide a loan to CEA to effectuate the Assignment of Claims to secure ATTI's receivables owed under the Subcontract" and "expressly discussed the purpose of the transaction and the reason for including SBLI."

fort at developed argumentation forfeits that claim.). CEA and ATTI specifically agreed in writing that CEA relinquished its authority to prepay the loan before the completion of the Kelly Contract. As the bankruptcy court found, "ATTI, given CEA's prior payment history, understandably was not willing to incur the risk of nonpayment and, therefore, insisted that CEA forego the right to prepay the loan, thereby ensuring that monies would flow through SBLI into the joint account." *In re Computer Eng'g Assoc., Inc. I*, 252 B.R. at 282. Moreover, ATTI required CEA to transfer to ATTI its obligations to prepare invoices, Contractor's Request for Progress Payments, and DD250s, and to provide access to CEA's COINS System so that ATTI could monitor CEA's activity in relation to the loan. CEA also authorized and instructed SBLI in writing "to provide [ATTI] . . . copies of all notices and actions concerning the CEA loan account with [SBLI] and authorize ATTI to make inquiries and to receive information concerning the loan." All of these measures were taken so that ATTI could prevent any attempt by CEA to prepay the loan.

Despite its repeated findings that CEA had relinquished "significant interests" in the Contract proceeds, the bankruptcy court ruled, without citation to authority, that CEA had not relinquished *all* its legal and equitable interests on the ground that there was no modification of the prime contract or a novation with ATTI and the USAF. This ultimate ruling is somewhat of a surprise given that the record strongly supports the bankruptcy court's numerous other findings that CEA had relinquished all control over the proceeds to ATTI. In any event, the trustee made no attempt to support the bankruptcy court's final ruling; he did not argue nor direct us to any supporting case law that either the prime contract would have to be modified or that the parties would have to enter a novation.

Instead, the trustee argued that there simply was no assignment to ATTI because CEA retained the right to direct SBLI to deposit the funds where ever it wished.

## IV

For the reasons stated, we hold that CEA assigned all rights, title, and interest in the accounts receivables to ATTI prior to the preference period. Therefore, the $1,241,511.07 that ATTI received for its work under the delivery orders is not subject to the trustee's avoidance powers. **We affirm.**