**In re AMERICAN PLUMBING & MECHANICAL, INC., et al., Debtors.**

Nos. 03–55789 to 03–55814.

United States Bankruptcy Court,
W.D. Texas,
San Antonio Division.

Feb. 3, 2005.

Berry D. Spears, Winstead Sechrest & Minick P.C., Austin, TX, C. Mark Brannum, Eli O. Columbus, J. Frasher Murphy, Winstead Sechrest & Minick P.C., Ishaq Kundawala, Cowles & Thompson, P.C., Dallas, TX, Demetra L. Liggins, Winstead Sechrest & Minick P.C., Houston, TX, for Debtors.

### MEMORANDUM DECISION ON APPLICATION OF GERALD RIGGS AND RICK JEPSON FOR PAYMENT OF ADMINISTRATIVE EXPENSES CLAIM

LEIF M. CLARK, Bankruptcy Judge.

CAME ON for hearing the foregoing matter. After trial, the court took the matter under submission. This decision constitutes the court's findings and conclusions thereon.

### Background

American Plumbing & Mechanical, Inc. and its affiliated companies filed a chapter 11 case in October 2003. AMPAM was a nationwide plumbing contracting firm, formed as a result of a "roll up" of numer-ous regional plumbing contractors in the 1990's. It ran into financial difficulties with its lenders and finally decided to seek chapter 11 protection in order to restructure its debt.

The owners of the regional companies continued to function in leadership capacities with what became, after the rollup, their operating subsidiary, both before and after the bankruptcy filing. Senior officers in each operating subsidiary were entitled,[1] pursuant to an incentive bonus program that had been in place prior to the filing of the case, to receive a bonus calculated on how well each division did, based on an EBITDA target, and an additional bonus to the extent this EBITDA target was exceeded. One of the first day orders signed in this case authorized the debtor to honor various employee benefits, including this incentive program (though it was not specifically referenced in that first day order). When it came time to consider 2003 bonuses in early 2004, the company's board of directors elected to pay bonuses to some officers, but held off paying senior executives (*i.e.*, persons who were stockholders of AMPAM or former owners of the debtor's operating subsidiaries, sometimes referred to as "Founders"), for fear of being sued by the Official Committee of Creditors, dominated at that time by the bondholders who held a debt in excess of $93 million. Eventually, the board directed the debtors' lawyers to file a pleading seeking independent specific authorization to pay bonuses to these most senior executives. The motion, filed in April 2004, alleged that the payments were in the ordinary course of the debtor's business, but acknowledged the possible argument that paying the bonuses to persons who were shareholders and/or Founders might

---

1. This use of this term should not, in this background section, be given any legal signifi-cance.

be inconsistent with the discharge of the board's fiduciary duties on behalf of the estate. Sure enough, the motion drew an objection from the creditors' committee, and was not heard before the plan was confirmed.[2]

During the course of the case, some of the senior executives from one of those operating subsidiaries, Riggs Plumbing, sought to "break away," triggering an injunction fight on the part of the bankruptcy estate. Gerald Riggs, the president of that operating subsidiary, quit his position with AMPAM, but was not actively involved in the breakaway company due to a covenant not to compete in his employment contract. Rick Jepson, one of the officers who *was* involved in the breakaway, also quit his position with AMPAM. After an injunction was issued by this court, the parties resolved their differences by agreeing to an asset sale of the Riggs operating subsidiary to the third party who had been funding the breakaway operation. The sale was ultimately approved by this court. Rick Jepson is now an officer with that new company, as is Gerald Riggs. The new company's trade name is Riggs Plumbing.

The chapter 11 debtors ultimately succeeded in obtaining confirmation of a plan. The plan drew no objection from Gerald Riggs or Rick Jepson, both of whom had actual notice of its provisions. The plan was confirmed August 2, 2004. The plan set a deadline for the filing of administrative claims, and both Riggs and Jepson filed this application just four days after confirmation, pursuant to that provision.

The application for payment of an administrative expense claim to Riggs and Jepson contends that Riggs earned a bonus of $118,845 and Jepson a bonus of $35,215[3] as a result of their division's having exceeded their EBITDA target number of $5,976,387 by $610,402. These bonus amounts represent both the bonus allegedly due to Gerald Riggs for the fourth quarter of 2003 (the incentive bonus plan contemplated a quarterly bonus based on quarterly EBITDA's exceeding target EBITDA), and a year-end bonus amount allegedly due to Riggs and Rick Jepson (and split between them), calculated at 15% as a percentage of the extent to which the total year's EBITDA *exceeded* the target amount. Jepson had been paid his fourth quarter bonus (and no one is challenging that payment). However, Jepson

2. The court learned, after some research, that human error within the clerk's office prevented the motion from being set for hearing, as it ordinarily would have been. The Western District of Texas is a CM/ECF court. When a pleading with negative notice (as was this motion) draws an objection, the objection shows up on a daily report, which is supposed to then trigger a setting. If, however, the clerk somehow misses the objection (and that is what happened here), no setting will occur. Neither the objection nor the underlying motion will show up again on any subsequent daily report, and the matter can thus easily fall through the cracks. Normally, if this occurs (and it happens rarely), the parties will bring the matter to the attention of the clerk, who will then promptly set it. This case was at a particularly contentious stage in the spring and early summer of 2004, and neither the debtor nor the committee were motivated to add one more item of contentiousness into the mix. As a result, neither of these parties ever contacted the clerk to ask for a setting. Neither, it may be added, did Riggs or Jepson (who were then involved in their own contentious fight with the debtor at the time). Once the plan was confirmed, the motion was, in the view of the debtor, rendered essentially moot. The debtor did not ask for it to be set. The court was unaware of all of this until the hearing on this motion, when the parties for the first time advised the court that the motion was still pending. The court apologizes to the parties for its error.

3. The applicants pointed out a mathematical error in the calculation that alters these numbers slightly.

still seeks his share of the 15% bonus for exceeding target EBITDA. Riggs (like the other Founders) was not paid either his fourth quarter bonus or his share of the 15% bonus, and seeks payment of both by this motion. According to the application, Riggs and Jepson say they are entitled to be paid their bonuses because (a) the court had already entered an order at the commencement of the case permitting the estate to continue to honor its incentive bonus plans, (b) the board of directors in February 2004 approved bonus payments per the terms of the incentive bonus plan, (c) a specific motion had been filed in April 2004 seeking permission to pay senior executives their incentive bonus, but was never prosecuted by the parties before confirmation (and that motion, say the applicants, constitutes a judicial admission that the bonuses are due and should be paid), (d) the bonus payments are simply part of the debtor's ordinary course of business, and so are payable as an expense of estate administration, and (e) no party has contended that these bonus payments are not administrative claims that should be paid.

The Plan Agent (Robert Nagel), as successor to the debtor(s)-in-possession, objected to the administrative claim, as did the official creditors's committee.[4] The Plan Agent stated that Riggs and Jepson were not eligible to receive a bonus under the terms of the company's incentive bonus plan or the terms of the motion that had previously been filed requesting authority to pay bonuses to certain executives.

First he notes that neither Riggs nor Jepson were employees as of the time of payment of the bonuses, because both resigned in April 2004. He points out that the terms of the 2003 incentive bonus plan (like all previous years' bonus plans) stated that persons who were no longer with the company were not eligible to receive bonuses under the plan. He also notes that the only bonuses that have actually been paid to any senior management were to those who stayed on with the reorganized debtor after confirmation, and the confirmed plan specifically allowed payment of bonuses only to these persons.

Second, the Plan Agent contends that Riggs and Jepson are not eligible for the bonuses they seek by this motion because AMPAM Riggs did not in fact meet its 2003 target EBITDA. He contends that certain insurance claims dating back to 2003, but which were not actually turned in to AMPAM corporate until late June 2004, after the sale of AMPAM Riggs, alter ending EBITDA because they must be factored in as liabilities on the 2003 operating statement for AMPAM Riggs. The Plan Agent says that, when these insurance claims are factored in, AMPAM Riggs' 2003 year end EBITDA actually falls below the target that would trigger entitlement to a bonus. The Plan Agent says that the board of directors were not (and could not have been) aware of these necessary adjustments, either when they initially approved anticipated bonus payments to AMPAM Riggs officers or when

---

4. The committee had also opposed the payment of incentive bonuses prior to confirmation, but did not contest the payment of those bonuses to certain executives *as provided in the plan*, which only permitted payment of outstanding bonuses to employees who stayed on with the reorganized debtor—and that excluded Riggs and Jepson. The committee did not prosecute its objection to this application, because, between the time the application was filed (August 6, 2004) and the time of the hearing (January 6, 2004), the plan had gone effective on October 6, 2004, at which point the committee went out of existence. The application was continued numerous times by mutual agreement to permit discovery. Committee counsel did enter an appearance to note its objection to the application, but did not otherwise participate in the hearing.

the motion to authorize payment of incentive bonuses was filed in April 2004.

### Findings of Fact and Conclusions of Law

At the hearing, the court was presented with documentary evidence and testimony relating to these issues. The following constitutes the court's findings and conclusions with respect to that evidence.

The court takes judicial notice of the contents of the first day motion to, *inter alia,* continue certain employee benefits post-petition, filed on October 13, 2003, as well as the order that approved that motion, signed on October 14, 2003. While the order authorized the debtor [5] to continue to honor its employee benefits, including the incentive bonus plan here at issue, it entrusted the discretion to actually honor those programs to the debtor's board of directors. The order did not expressly find that either the benefits or the bonuses qualified as allowed administrative expenses. The order did not require the board of directors to comply with the terms of the pre-petition employment agreements, nor did it make any findings that such agreements would be enforceable by employees against the estate. The order was entered within days of the case being filed, based upon the unique situation of the debtor in the first days of the case.

The court also takes judicial notice of the contents of the debtor's motion for order approving payment of annual incentive bonuses to employees, filed on April 5, 2004.[6] This motion was filed just days before the scheduled initial hearing on the debtors' disclosure statement. The debtor stated in that motion that its board had approved the amount of bonuses to be paid at its February meeting, but had deferred actually authorizing payment of bonuses to senior management personnel, and had also deferred paying any additional bonuses due executives. The motion claimed that the payments were in the ordinary course of business, but also anticipated objections from the Committee, and so also asserted that the bonuses should be paid, to incentivize senior management to stay with the company to complete the reorganization.[7]

The court also takes judicial notice of the confirmed plan, which provided at ¶ 13.19 that the board of directors of reorganized AMPAM had the authority to authorize and cause the performance by the reorganized debtor of the payment of bonuses "... to officers or employees of *Reorganized* AMPAM or of any *Reorganized* Subsidiary." Third Amended Joint Plan of Reorganization, ¶ 13.19 (docket # 1745, confirmed by court order on August 2, 2004, docket # 1754) (emphasis added). Neither Riggs nor Jepson, of course, were officers of either Reorganized AMPAM or any of its reorganized subsidiaries as of plan confirmation. Neither objected to the plan.

The incentive bonus plan that forms the basis for Riggs' and Jepson's claim was put into place in 2000. It was designed "to

---

5. For ease of reference, the court will refer to "debtor" in this decision. There were actually 26 debtors that filed for chapter 11. The cases were jointly administered. *See* FED. R. BANKR. P. 1015. The plan substantively consolidated the debtors.

6. The motion stated that fourth quarter and year-end incentive bonuses had not yet been paid to what the motion described as "eligible 2003 participants." Riggs was listed along with 9 other senior officials. Riggs resigned from AMPAM two days after this motion was filed.

7. Two days after this motion was filed, Gerald Riggs tendered his resignation. Rick Jepson resigned a few weeks later. Neither resigned because of the non-payment of bonuses.

incentivize the presidents and general managers of [AMPAM's] operating subsidiaries/business units toward peak performance." Plan Agent's Brief in Support of Objection to the Riggs and Jepson Application for Payment of Administrative Expenses' Claim, at p. 1. It called for participants to be eligible to receive a base bonus of up to fifty percent of base salary once the target EBITDA was achieved, along with an additional bonus if the goal was exceeded. Prior to bankruptcy, the bonus was paid to eligible employees on a quarterly basis, after performance figures for that quarter had been audited, and the bonus approved by the board of directors. The 2003 Key Management Bonus Plan (*i.e.*, the incentive bonus plan) contained the 50% of base salary bonus feature described above (or a partial bonus of 75% of the bonus if the target was at least 90% achieved or 90% of the bonus if the target was at least 95% achieved), and was described in a letter from the president of the company to key employees. The letter went on to explain that "[o]ne half of the quarterly bonus (i.e. 1/8 of the yearly bonus target) shall be paid upon the closing of the quarterly books if 100% of the year-to-date set threshold of adjusted income before taxes for his/her location has been achieved." Riggs Exhibit 4. There was also provision for an additional bonus if target EBITDA was exceeded: "[I]f the yearly adjusted income before taxes threshold for the location is exceeded, the

participant will share with other participants, if any, at the operating subsidy in 15% of the excess of income before taxes over the set threshold. There is no maximum on this bonus." Riggs Exhibit 4. The letter explained that "[u]pon completion of the year, any additional bonus owed shall be paid." Riggs Exhibit 4. The letter also contained this caveat: "As always, those participating in the Plan must be *an active employee at the time each payment is made*. If a participant is not an active employee, he/she will not be entitled to any payment *whether accrued or unaccrued*." Riggs Exhibit 4 (emphasis added).

According to the 2003 Bonus Calculation considered by the Board of Directors at its February 2004 meeting (and based upon unaudited year-end figures),[8] the "actual" EBITDA figure for AMPAM Riggs was $6,586,789, an amount that exceeded the target of $5,976,387 by $610,402. The year-end bonus for the division, 15% of $610,402 (assuming the numbers stood up), would have been $45,780, to be shared by Riggs and Jepson. Jepson was paid his fourth quarter bonus (which was calculated on the basis of having reached the target EBITDA for that quarter), but Riggs (along with the rest of AMPAM's senior management team) was not paid his fourth quarter bonus. *See* Nagel Exhibit 9. Neither were paid the 15% excess bonus. Target EBITDA and actual EBITDA are

8. One bone of contention among the parties has to do with the issue of when the bonus was actually due to be paid. According to the letter that described the terms of the 2003 incentive bonus plan, quarterly bonuses are "paid upon the closing of the quarterly books ..." Then, *upon completion of the year,* any additional bonus owed shall be paid." Finally, if the yearly adjusted income before taxes threshold for the location is exceeded, the participant can receive his or her share of 15% of the excess of income before taxes over the set threshold. Riggs Exhibit 4. The Plan Agent contends that nothing is due to be paid until "the books are closed," while Riggs and Jepson maintain that the bonuses are due at year end, though they might not actually be paid until February or March of the following year (to allow for calculation). Riggs and Jepson note that in years past, bonuses were regularly paid in February or March of the following year. The Plan Agent responds that, in years past, the books were closed by that time. In 2004, however, the books were not yet closed because of the status of the bankruptcy case.

thus critical components for computing entitlement to the incentive bonus.

Riggs had an employment agreement with the company, but Jepson did not. With regard to bonuses, the employment agreement stated that AMPAM "... will consider adopting an incentive bonus plan under which Executive and other key employees of the AMPAM Companies will be eligible to receive annual bonus awards in amounts that are competitive with those provided to similarly situated executives, *as determined by the AMPAM Board.*" Riggs Exhibit 6, at p. 2. The agreement further specified that "Executive shall be entitled to participate in all incentive compensation plans and to receive all fringe benefits and prerequisites offered by the Company or AMPAM to any of the Company's or the AMPAM Companies' similarly situated executives, including without limitation, participation in the various employee benefit plans or programs provided to the employees of the Company or the AMPAM Companies in general, subject to the regular eligibility requirements with respect to each such benefit plans or programs." Riggs Exhibit 6, at p. 3. The agreement had a five year term, which automatically renewed from year to year thereafter unless a party gave six months' notice prior to the anniversary date. Riggs' employment contract reached its

five year mark in February 2004, but neither he nor the company gave notice six months prior to that date. Therefore, the contract automatically renewed.

The employee (*i.e.,* Riggs) could terminate with good reason, or without. If he terminated with good reason (or the employer terminated him without cause), then the employee was entitled to a generous severance. If the employee terminated "without Good Reason" then the employee received no severance. Riggs Exhibit 6, at p. 8. Even if the employee terminated without good reason, he was supposed to give 30 days' notice. The terms of the agreement spell out what constitutes good reason for termination on the part of the employee, and none apply here.[9] Riggs terminated his employment by a letter from his lawyer dated April 7, 2004. The letter stated, as grounds for termination, the following:

> ... [A]s you know, Mr. Riggs' employment agreement expired in February 2004. He agreed to stay on to try to consummate this transaction.[10] Since the Debtors have rejected multiple proposals without any serious counteroffer, he sees no need to remain at AMPAM Riggs. Therefore, Mr. Riggs hereby submits his resignation effective as of April 21, 2004. This will give the Debtors two weeks notice.

**9.** "Good Reason" is defined to include demoting the executive, reducing the base salary, relocating the company's out of the greater Phoenix area, assigning duties to the executive that are inconsistent with the executive's title, position or responsibilities, or failing to continue in effect any employee benefit plan in which the Executive participates. "Good Reason" as a basis for quitting could only count if the executive gave 30 days' notice and opportunity to cure to the company. Riggs Exhibit 6, at 8.

**10.** This is a misstatement of the terms of the agreement, as detailed *supra* in this opinion. Though he threatened, in an email the day

before the termination of his contract "not to come to work tomorrow," he nonetheless did return to work, and did not submit any formal resignation letter at that time. Neither did he sign any agreement with the debtor that conditioned his staying on with the company. The contract is clear regarding automatic renewal, and how to prevent it. The contract automatically renewed, with no binding stipulations or contingencies in place with regard to that renewal. Mr. Riggs' reasons for staying on are not relevant to the question whether the contract in fact automatically renewed by its terms.

Nagel Exhibit 7. No mention was made in the letter of any grounds that would constitute "good reason" under the terms of the contract. More to the point, the letter says nothing about nonpayment of the bonuses which are now being demanded, even though they remained unpaid for well over a month after the board meeting. The letter was sent two days after the debtor had filed its motion seeking court approval to pay bonuses to senior executives.

Riggs says that he relied on the debtor's having filed this motion in resigning when he did. Jepson (who did not have an employment contract) resigned two weeks after Riggs did (he testified at the injunction hearing last year that he quit because Riggs had quit). Through his counsel, Jepson also alleges reliance on the debtor's having filed this motion. The essence of the argument is that, had the motion not been filed, then Riggs and Jepson would have stayed on with the debtor, in order to make sure they got their bonuses.[11]

Riggs' employment contract contained the following general provision:

> Upon termination of this Agreement for any reason provided above ... Executive shall be entitled to receive all compensation earned and all benefits and reimbursements due through the effective date of termination, paid to Executive in a lump sum on the effective date of termination. In addition, a termination of this Agreement shall not alter or impair any of Executive's vested

rights or benefits, if any, under any (i) employee benefit plan of the AMPAM Companies ...

Riggs Exhibit 6, at p. 8. This provision seems to assure Riggs that he is entitled to be paid whatever he earned, and whatever might be due to him under any benefit plan, regardless whether termination of the agreement was "with Good Reason" or "without Good Reason." Thus, the terms of the incentive bonus plan itself (and any controlling law, be it bankruptcy law or state law) determine whether Riggs receives his bonus. Rick Jepson, who was an officer of AMPAM Riggs, did not have an employment contract, but was a key management employee, one of the intended beneficiaries of the incentive bonus plan.

Not long after Jepson resigned, he was named in the injunction suit brought by AMPAM, as was Riggs. That litigation was ultimately settled when the assets of AMPAM Riggs were sold for $12 million to the third party who had been underwriting the breakaway operation. The sale was approved by the bankruptcy court. Both Jepson and Riggs are now associated with the new company formed by the buyer, and the new company once again bears Riggs' name as its trade name.[12] As of the date of their respective resignations, the bonuses in question had not been paid either to them or to anyone else with AMPAM. Under the terms of the incentive bonus plan, therefore, they are not entitled to receive their bonuses.[13]

---

**11.** Quitting one's job is not, in this court's view, a version of "detrimental" reliance that counts for purposes of triggering equitable estoppel, especially as the stated reason for quitting had nothing to do with what Riggs and Jepson now claim is their basis for "detrimental reliance." In any event, the filing of the motion was no assurance that it would be granted—as at least Riggs was surely aware. *See* discussion *infra* regarding benefit to the

estate as a basis for the allowance of an administrative claim.

**12.** For this reason, this opinion will refer to the new company as "new Riggs."

**13.** Riggs and Jepson argue that this provision (*i.e.,* that only those currently employed are entitled to receive bonuses) is unenforceable

One of the reasons proffered by the Plan Agent for claiming that Riggs and Jepson are not entitled to the bonuses they are seeking has to do with insurance claims. In developing EBITDA, the company must recognize accrued liabilities. Some of the liabilities arise from various claims that can be asserted against the company, of the sort that would normally be covered by insurance—water damage from a faulty pipe installation, injury to a worker on the job, injury to a third party in an auto accident, and breach of warranty claims are examples. AMPAM purchased insurance at the corporate level for all of its affiliated companies, and handled risk management at the corporate level. However, most of AMPAM's policies had relatively high deductibles, or self-insured retention clauses, or other similar features which had the effect of forcing AMPAM to bear the initial economic loss. AMPAM shared this loss among the divisions and affiliates by re-allocating to each entity its share of that economic loss, subject to certain caps designed to "smooth out" losses among all the companies. When a claim was reported to one of AMPAM's insurers from one of the divisions, AMPAM corporate would "develop" the claim (under generally accepted accounting principles) to arrive at a "true cost," and that cost would then be charged back to that division, up to a maximum of $250,000 per claim. Development involved evaluating the claim as made, then applying a risk factor derived originally from industry experience, but subsequently refined to reflect AMPAM's own experience.[14] The developed cost was an expense that thus directly affected the bottom line, reducing EBITDA.

Key to accurately handling (and booking) insurance claims was their prompt submission to AMPAM corporate. According to Phil Thompson, AMPAM's Risk Manager, the longer a claim is held and not submitted, the greater the risk that the claim will cost more to resolve (and the greater the risk that the insurer might deny coverage on that claim or alter its willingness to insure in the future). What is more, a claim that is not reported timely will not be developed timely and so will not be timely incorporated as an expense for purposes of accurately deriving an operating subsidiary's end-of-year EBITDA. That, in turn, means that an operating subsidiary's end-of-year EBITDA could be inflated if insurance claims were not reported in time to be factored in—with a direct benefit in favor of senior management, whose bonuses turn on exceeding targeted EBITDA. In the past, this was not as significant an issue because, once discovered, any reporting error would be calculated and the resulting impact would be offset against the next year's bonus. If, however, an executive were to *leave* the company, there would be no later year against which to recoup the bonus overpayment.

Both Riggs and Jepson left AMPAM in the April 2004. On June 21, 2004, just two weeks after the asset sale of AMPAM Riggs had closed, the new company ("new

---

as a matter of Texas law. The issue is discussed later in this decision.

**14.** The insurance memo to divisions explained that "Developed Losses are the last component of insurance expense, and relate directly to the claims experience of each location ... In order to account for the expected ultimate cost of program losses, general liability, auto liability and workers compensation coverage losses will be increased by multiplying change in each operating location's 'book' of claims on a monthly basis by loss development factors." Nagel Exhibit 15. The applicable factors in place for year 2003 were 2.75 for auto liability and 3.685 for general liability, which category includes claims by customers for faulty installations.

Riggs") turned in 15 insurance claims to AMPAM corporate, many apparently relating to matters that had arisen in 2003, of which AMPAM corporate was previously unaware. The Plan Agent contended, in his response to Riggs' and Jepson's application for bonuses, that these claims should have been turned in to the company (or to the insurers) in 2003. The Plan Agent says that, had that been done properly, the resulting developed claims would have resulted in an adjustment to EBIT-DA that would have eliminated Riggs' and Jepson's claimed bonus entitlement. The Plan Agent says that neither Riggs nor Jepson should be allowed to benefit from wrongdoing on the part of AMPAM Riggs.[15] This is especially so, says the Plan Agent, because Riggs and Jepson are no longer with AMPAM, so there is no possibility to recoup.

Riggs and Jepson counter that these claims had not previously been reported because they had been "self-administered" in accordance with an AMPAM policy adopted in 2002. They were only turned in by new Riggs because, when it bought the assets of AMPAM Riggs, it did not assume the old entity's liabilities.

The details of the insurance claims thus became a central trial issue, and must occupy a portion of this factual recitation. We begin by examining the issue of "self-administration" of claims. In 2002, AMPAM, in consultation with its various operating subsidiaries and affiliates, concluded that overall claims administration might be more cost effective if each subsidiary and affiliate had the option of "self administering" claims with an expected liability under $10,000. Instead of turning in such claims to insurance, where they would, of necessity, have to be handled by the company's risk management contractor (for a fee), the operating subsidiary (after being appropriately certified by AMPAM corporate's insurance department) could elect to deal with these small claims in-house. Perhaps the claim could be resolved by getting another contractor on a job to agree that the damage claimed was his fault, and he would assume liability. Or perhaps the operating subsidiary would agree to fix the claimed damage at its own expense internally. Or perhaps the operating subsidiary might conclude internally that the claim was baseless, and so worth the risk of carrying. Each operating subsidiary could have its own company-approved internal "risk manager," whose task it would be to make the call whether a claim fell under the $10,000 threshold, elect to keep or not to keep, and to deal with the claim through resolution.[16]

Of course, there was always the possibility that a given self-administered claim might "blow up," in which event the operating subsidiary would have little real choice but to turn in the claim. To encourage good judgment and prevent abuse, AMPAM started a policy of penalizing operating subsidiaries for self-administering a claim that, as it turned out, should not have been self-administered after all but should instead have been promptly turned in to corporate. The solution also applied

---

**15.** That is, the former division of AMPAM whose assets were sold. Both Riggs and Jepson were officers of AMPAM Riggs, and their bonuses would be calculated based on the EBITDA performance of AMPAM Riggs.

**16.** AMPAM Riggs had a person whose tasks included handling these self-administered claims (including the task of evaluating whether a given claim qualified for self-administration). There was some question whether this person was in fact properly certified. Phil Thompson testified that AMPAM Riggs itself was not properly certified to self-administer claims. If an operating subsidiary was not so certified, then it was not authorized to self-administer claims at all.

to "efforts to cover up claims and/or suppress the reserves on the claims ..." Nagel Exhibit 15, at p. 3. In a memo to Riggs, Jepson and Debbie Cook (another AMPAM Riggs officer) dated November 15, 2002, AMPAM corporate's risk management officers stated that—

> In any event to reduce this type of activity, effective November 1st [2002], a location will forfeit its deductible and become subject to the AMPAM deductible for any claims where losses occur as a result of the actions or inactions listed below:
>
> ... 3. Failure or intentional non-reporting of a claim
>
> ...
>
> c. Intentional efforts to suppress reserve development to avoid development charges being incurred by a location.

Nagel Exhibit 15, at p. 3.

The location deductible per incident was capped at 10% of AMPAM's deductibles. Thus for auto and general liability claims, the corporate deductible was $250,000 and the location deductible per incident was $25,000. This deductible served as a "cap" on losses before development. Losing the benefit of that cap would thus have a serious impact on an operating subsidiary's year-end EBITDA. Thus, the circumstances surrounding the claims against AMPAM Riggs turned in by new Riggs to AMPAM corporate takes on major significance.

Riggs and Jepson say that these claims were all properly self-administered (as were a number of additional claims submit-

ted later) by AMPAM Riggs, and that none were intentionally "held back" by AMPAM Riggs (prior to the sale of its assets) in order to artificially inflate 2003 EBITDA. In any event, they add that (1) the claims pose no real exposure to AMPAM (and so should not be counted against year 2003 EBITDA) and (2) many of the claims were in fact already "known" to AMPAM corporate, and so would presumably have already been incorporated into AMPAM Riggs' EBITDA for purposes of computing the bonuses.

The Plan Agent, on the other hand, says that these claims should not have been self-administered in the first place, and that, as a result, the developed losses associated with these claims should be used to adjust 2003 EBITDA. The Plan Agent also contends that some of the claims that should have been turned in were intentionally withheld, with the result that the deductible applicable to those claims should be AMPAM's deductible of $250,000 per such claims, not the more limited location deductible (10% of AMPAM deductible).

To resolve these competing contentions, one must (unfortunately) examine the claims in some considerable detail. It is to that task that we next turn.

Fifteen claims were transmitted by new Riggs to AMPAM corporate on June 21, 2004. All of these claims had previously been self-administered by AMPAM Riggs as claims not likely to exceed $10,000. Of these claims, seven are attributable to year 2003 EBITDA, because they were known to AMPAM Riggs in that year.[17] By the

---

17. The rules of the game established by the evidence are that claims which were not "known" in year 2003 should not be attributable to year 2003 EBITDA, but should instead be treated as expenses of the following year, even though the events that gave rise to the claim might themselves have occurred in 2003. The seven claims (as listed in Nagel Exhibit 7, turned in June 21 that fit this criteria are Ingeneri, Long, Armstrong, Friend, Herman, Franey, and Galloway.) Two of these claims actually arose in 2002, but as those claims were not disclosed at that time, it is right to recognize them in year

time they were turned in, AMPAM's own risk analysis of the claims (based upon exposure on the face of the claims) reflected an estimated loss of $194,578. After developing the claims per the procedure described earlier in this decision, the location's resulting liability was $532,768. *See* Nagel Exhibit 6. We use this number as a starting number for adjusting AMPAM Riggs' 2003 EBITDA.

On August 5, 2004, new Riggs turned in a previously unreported automobile-personal injury claim, based upon an automobile accident that had occurred in September 2003, in which a young man was injured. The estimated loss on the claim was $519,986. Automobile claims which involve personal injury were never to be self-administered, and no good reason was offered for why this claim was not turned in promptly. The size of the claim also made it likely that it would directly and adversely affect 2003 EBITDA. These factors lead the court to believe that it was intentionally withheld. By not disclosing the existence of the claim in the face of clear policy that required such claims not to be self-administered in the first place, AMPAM Riggs assured that any adverse impact would be deferred to 2004—a year not likely to generate a bonus in any event because the company would be coming out of bankruptcy. The court concludes that this claim was intentionally suppressed to avoid development charges being incurred by AMPAM Riggs and that, as a result, AMPAM Riggs should have to forfeit its location deductible and instead be subject to the AMPAM deductible, which was $250,000. The impact increases the downward adjustment to AMPAM Riggs' EBITDA to $782,768.

Since then, new Riggs has continued to send in claims with incident dates that predated the end of 2003. Two of these claims, however, appear to have been subrogation claims from claimant insurers, such that AMPAM Riggs would not have been aware of them prior to the end of 2003, and so should not be counted against 2003 EBITDA. These claims are not included in the adjustment figure. Another claim, that of Charity Pilgrim and reported in August 2004, was actually already previously reported to AMPAM, and so also need not be included as part of the adjustment to EBITDA (it is presumed to have already been incorporated). There were two claims reported in October 2004, with an estimated loss of $16,741.71 and $94,775.18, respectively, and a developed cost of $61,691.73 and $184,250, respectively. The total of these amounts is $245,941.73, increasing the adjustment to EBITDA number to $1,028,710 (the number is rounded to the nearest whole dollar).

If that number stands, then neither Riggs nor Jepson would be entitled to the 15% year end bonus for exceeding EBITDA. In addition, Riggs would not be entitled to receive his fourth quarter bonus, because, with these adjustments, target EBIDTA was not achieved.

Riggs and Jepson argued that at least three of the June 21 claims were claims that would not have shown up on EBITDA anyway, because they were properly self-administered (the estimation of loss, without development, was less than $10,000 for each claim). This misses the point. Regardless whether they were properly self-administered, they are still now claims which are attributable to 2003 operations.

2003 (if they were not properly disclosed in year 2002, and so not incorporated in that year's EBITDA, then they also were not properly disclosed in year 2003, when they could have been and should have been recognized).

Because AMPAM Riggs is not a continuing enterprise, there is no "subsequent year" in which to take these losses. They must be incorporated into the year to which they are attributable—especially in light of the fact that Riggs and Jepson expect to be paid a bonus from a company they already resigned from based on the performance figures from that self-same year. The books need to be closed, but that means incorporating all relevant data to arrive at the final, correct number for 2003 EBITDA before calculating a bonus from that number.

Riggs and Jepson also argued that AMPAM Riggs had internally determined that all of the June 21 claims were properly evaluated as "less than $10,000" in exposure, and so were properly self-administered. They are only now being turned in because new Riggs did not assume the insured liabilities of AMPAM Riggs. Had there never been a sale, AMPAM Riggs would simply have absorbed whatever losses were associated with these claims. If they were properly self-administered at the time, the claims should not be counted against 2003 EBITDA, say the applicants.

The argument fails, however. As a result of both the asset sale and the order of confirmation of AMPAM's plan of reorganization, there is no AMPAM Riggs in existence to absorb the expense that these numbers represent. It is clear from the testimony that none of these items was satisfied by AMPAM Riggs before they were finally turned in to corporate by new Riggs, meaning that none of these items had any impact on AMPAM Riggs' 2003 bottom line.[18] They must be accounted for, regardless whether they were properly self-administered at the time.[19] The court rejects Riggs' and Jepson's contention to the contrary.

The Plan Agent, on the other hand, takes the view that, if claims were *not* properly self-administered, then the developed cost (and consequent adjustment to EBITDA) for that claim automatically goes to $250,000, the amount of AMPAM corporate's deductible. He takes this position based on his reading of the insurance memorandum. *See* Nagel Exhibit 15. There are two such claims, in addition to the automobile liability claim discussed earlier. The Ray Herman claim shows an estimated loss, before development of $100,000, and a developed exposure of $184,250. This claim arose in July 2003, and was reported to AMPAM Riggs in September 2003. The Ferrara claim shows an estimated loss, before development, of $94,775.18, and an exposure of $184,250. This claim arose in October 2003, and was reported to AMPAM Riggs in November 2003. Neither of these claims should have been self-administered, leading the court to conclude that both

18. In previous years, if AMPAM Riggs elected to self-administer a claim, then the cost of handling the claim would of course show up on AMPAM Riggs' operating statement as an expense item. Thus, for example, were the company to have self-administered a warranty claim with exposure of $9,000, and ultimately resolved it for $4,000, that $4,000 number would show up on AMPAM Riggs operating statement as an expense item. None of the claims discussed here fall into this category—they are all open, unresolved claims that will require new effort (and probably new money) to finally resolve.

19. It is worth adding that the balance of the claims were not properly self-administered. First, on their face, they reflect claims exposure in excess of $10,000, and so should have been promptly turned in. The fact that they were not, in the face of clear policy that they should have been, indicates that they were intentionally withheld. Further, AMPAM Riggs was not certified as an operating subsidiary with authority to self-administer, depriving AMPAM Riggs of shelter.

claims were intentionally withheld (there being no independent justification for not turning in the claims, given the estimated amount of these claims).

The consequences for EBITDA, however, are not as draconian as the Plan Agent suggests. The "insurance memo," Nagel Exhibit 15, states that the consequences for withholding claims as the court has found here is that the location "will forfeit its deductible and become subject to the AMPAM deductible." This means, according to the testimony at trial, that AM-PAM's deductible of $250,000 becomes the new cap on the dollar amount of the estimated claim (before development), rather than the location deductible of $25,000. Thus, instead of these claims being capped at $25,000 apiece (before development), they are capped at $250,000 before development. Though both claims exceed the $25,000 cap, they fall below the $250,000 cap. They are "subject to the AMPAM deductible," but that does not mean that they are automatically *increased* to the amount of that deductible. There is no basis in the insurance memorandum for assessing the "penalty" that the Plan Agent suggests. Thus, the adjustment stands at $1,028,710.

Riggs and Jepson next argue that the actual exposure of AMPAM is much less than the developed numbers, and that the court should not adjust EBITDA for anything more than what the court finds the actual exposure to be. The problem with this approach is that it presumes that AM-PAM Riggs' former risk manager's testimony regarding the likely exposure on these claims can literally be taken to the bank. The reality, unfortunately, is that, until the claims are truly resolved, there are no guarantees. The appropriate ap-

proach is the one suggested in the insurance memorandum, and by prudent business practice—adopt the guidelines which both generally accepted accounting principles and the actual history of AMPAM's losses on claims in the past support. That, to the court, is far more credible and reliable than the assurances of a witness who now works for new Riggs—under Jepson and Riggs.[20]

When EBITDA is thus adjusted, using the number at which the court has arrived, it more than consumes the overage over the target EBITDA, so that no 15% bonus would be owed to Riggs or Jepson. In fact, target EBITDA was not met. The actual EBITDA, as adjusted for these insurance claims, should be $5,558,069. That is more than 90% of target EBITDA, but less than 95%, entitling Riggs to only 75% of the yearly bonus—and he was already been paid that amount in the first three quarters of 2003. *See* Nagel Exhibits 9, 4.

Riggs and Jepson challenge the propriety of "back adjusting" EBITDA in this fashion, on grounds that the bonuses in question were due and payable in February, when the board of directors determined what the bonuses should be. Further adjustments to year-end EBITDA cannot, they say, have any impact on what they were due to be paid as of that date. The Plan Agent responds that the bonuses (especially the 15% bonus) could not in fact be paid until the books were closed, and that they were not closed in February 2004.

■ On the issue of when the bonuses were due to be paid, the incentive bonus letter (Nagel Exhibit 4) is dispositive—the bonuses were not due to be paid until the

---

20. Mr. Martinez, the person assigned by AM-PAM Riggs with the task of risk management, was neither experienced nor trained in the area. He had been a job superintendent before he was moved into this new position. He now is a regional manager for new Riggs.

closing of the books. The phrase "[u]pon completion of the year" upon which both parties focused in their closing to the court refers to the closing of the books, not the end of the calendar year. *See* footnote 8 *supra*.[21] The testimony at trial confirms that closing did not occur in February 2004. Riggs' and Jepson's argument in this regard is rejected.

Even were a bonus otherwise due as a matter of fact, they are not due as a matter of law. This is because, in order to be eligible for payment in full from the estate, the bonuses must first qualify as allowed administrative claims under section 503(b)(1)(A) of the Bankruptcy Code. If the bonuses in question are compensation for services performed prior to the filing of the case, then they would only qualify as pre-petition unsecured claims, which in this case are not being paid in full by the estate.[22] Riggs and Jepson are not entitled to be paid from the reorganized debtor, because the plan allows bonuses only to officers of the reorganized debt-or(s). *See* Third Amended Joint Plan of Reorganization, at ¶ 13.19 (as confirmed by order of the court on August 2, 2004). Neither Riggs nor Jepson continued on in that capacity.

 Riggs and Jepson, if they are to be paid their bonuses at all, then, must establish their bonus claims as post-petition pre-confirmation liabilities of the bankruptcy estate. The Bankruptcy Code provides only one avenue for the award of claims in this category-- and that avenue is section 503(b)(1)(A), which states that "[a]fter notice and a hearing, there shall be allowed administrative expenses, including—(1)(A) the *actual, necessary costs and expenses* of preserving the estate, including wages, salaries, or commissions *for services rendered after the commencement of the case* ...". 11 U.S.C. § 503(b)(1)(A) (emphasis added). Thus, a claimant must establish that its claim constitutes an actual *and necessary* expense of the estate in order for *the estate* to be bound to pay the claim.[23] With regard to wage claims, the

---

**21.** This legal conclusion regarding the interpretation of the incentive bonus plan also affects another legal argument advanced by Riggs and Jepson—that they became entitled to their bonuses prior to their resignations. Their resignations occurred *before* the bonuses were payable. This still leaves the question whether, as a matter of law, the bonuses were *due*, even though they were not yet payable. But that question too is resolved by the court's construction of the relevant phrase because the sentence concludes "any additional bonus *owed* shall be *paid*." The amount of the "additional bonus" cannot be known with a certainty until the books are closed—because the amount of bonus owed is contingent on determining the EBITDA actually achieved by the operating subsidiary. Thus, it is not owed until it is first known to be owed—and that cannot happen until the books are closed.

**22.** In fact, pre-petition unsecured creditors in Class VI received only warrants with limited exercise rights.

**23.** The word "including" in the statute does provide the court with some flexibility to account for unusual claims that ought to be treated as administrative expenses but which might not fall within the rubric of the statute's specific subdivisions. Thus, for example, courts have recognized that tort damage caused by the estate might need to be paid as an administrative expense even though there is no specific provision that allows for such a claim—and such claims can only be said to be an "actual necessary expense of preserving the estate" by the most strained construction of that phrase. *See In re Piper Aircraft Corp.*, 169 B.R. 766, 776 (Bankr.S.D.Fla.1994) (to get administrative-expense status, the tort claim must arise from a transaction with the debtor-in-possession, and that transaction must have benefitted the DIP in the operation of its post-petition business). However, when a claim by its nature *does* fall within the general parameters of a subsection of the statute, it should be allowed or disallowed based upon whether it does or does not qualify under that subsection. An overly expansive

claim must be for services *rendered after* the commencement of the case, not before. The Fifth Circuit has said that "[i]n order to qualify as an 'actual and necessary cost' under section 503(b)(1)(A), a claim against the estate must have arisen post-petition and as a result of actions taken by the trustee that *benefitted the estate."* See *Toma Steel Supply, Inc. v. TransAmerican Natural Gas Corp. (In Matter of TransAmerican Natural Gas Corp.),* 978 F.2d 1409, 1416 (5th Cir.1992); *In re Jack/ Wade Drilling, Inc.,* 258 F.3d 385, 387 (5th Cir.2001) (emphasis added). To attain such status, a claim " 'must have arisen from a transaction with the debtor in possession and must then confer a benefit on the debtor's estate." *In re Phones For All, Inc.,* 288 F.3d 730, 732 (5th Cir.2002), *citing In re Commercial Financial Services, Inc.,* 246 F.3d 1291, 1294 (10th Cir. 2001). In the vast majority of cases, ordinary course of business expenses are presumed to confer a benefit, because a chapter 11 debtor attempting to reorganize is permitted to continue to operate its business as debtor in possession as part of the reorganization process. *See* 11 U.S.C. § 1108; *TransAmerican Natural Gas Corp., supra* at 1415 ("[t]he purpose of Section 503 is to permit the debtor's business to operate for the benefit of its pre-petition creditors," *citing In re Coastal Carriers Corporation,* 128 B.R. 400, 403

(Bkrtcy.D.Md.1991)). If a post-petition cost happens to remain unpaid, however, and a claim is submitted for that expense (as Riggs and Jepson have done here), it still must qualify under section 503(b) or it cannot be paid. That, in turn, means that "benefit to the estate" must be established. "Ordinary course" is not a magic talisman that enables a claimant to evade the primary obligation of establishing a benefit to the estate. *See In re Phones For All, Inc.,* 288 F.3d, at 732.

Riggs and Jepson say that their claims have already been established as allowed administrative claims because the court, in one of its first day orders, authorized the debtor to honor various employee benefit programs, including its incentive bonus plan. However, the court did not *order* the estate to pay such bonuses. It merely *authorized* the board, acting in its capacity as decision-maker for the debtor-in-possession, to, *inter alia,* make bonus payments *in its discretion. See* Riggs Exhibit 2. Honoring certain pre-petition employees wage and benefit claims early in the case was justified for the same reason as was approving certain critical vendor payments—the detriment to pro rata distribution was outweighed by the need to maintain the reorganization process, seen as the only route likely to lead to paying unsecured creditors of the estate anything at all.[24] In no event did the court find, in

---

use of the term "including" would render the specific subsections essentially advisory, and would undermine Congress' intent in crafting those specific provisions. *See In re Colortex Indus., Inc.,* 19 F.3d 1371, 1377 (11th Cir. 1994) (noting that, although the use of the word "including" is not intended to be limiting, "section 503 priorities should be narrowly construed in order to maximize the value of the estate preserved for the benefit of all creditors."). This claim, being in the nature of a claim for a species of "wages," should be governed by the specific provision of section 503 enacted by Congress, and by the case law that has construed that provision.

**24.** The propriety of paying *any* pre-petition claims post-petition has been called into serious question by the Seventh Circuit in *In re Kmart,* 359 F.3d 866 (7th Cir.2004). The court declined to consider whether such payments could be treated as "administrative expense" claims, no doubt in large part because section 503(b)(1)(A) itself limits such claims to those arising from services rendered *after* the commencement of the case. *See id.* at 872; 11 U.S.C. § 503(b)(1)(A). If a statutory basis were to be found for allowing payment of pre-petition wage claims and critical vendors, one would have to look elsewhere in the Code.

that order, that paying these pre-petition wage claims constituted the allowance of those claims as *post-petition* administrative claims under section 503(b)(1)(A).[25]

Months later, as the debtor was embroiled in negotiations with bondholders who were owed over $93 million, the board of directors concluded (justifiably, as it turns out) that if they paid bonuses to senior managers (many of whom were also shareholders), while they proposed a plan in which unsecured creditors were to receive no cash distributions at all, they would in all likelihood be sued by the creditors' committee. Though the board had approved the preliminary numbers at their February meeting and used those numbers to actually pay fourth quarter bonuses to lower echelon members of the management team, it did not affirmatively approve payment to the most senior management nor did it elect to pay anyone their 15% excess bonus for exceeding target EBITDA. *See* Nagel Exhibit 9. Later, under pressure from a number of senior management persons, debtor's counsel was instructed to file a motion to authorize these remaining payments anyway, hoping to get court approval to pay the bonuses and so eliminate the threat of suit by the committee.

The motion, filed April 5, 2004, argued, *inter alia,* that the payment of these bonuses would confer a benefit on the estate.[26] The motion promptly drew the an-

ticipated objection from the creditors' committee, most of whose members were bondholders who were at that very moment fuming over a proposed plan that would leave them with essentially nothing. For the reasons explained *supra* at note 2, the motion was never heard (or pressed, for that matter, by any interested party, including Riggs or Jepson).

Had it been heard, however, the motion to pay bonuses would likely not have been approved. As has already been noted, to allow an administrative claim, there must be a showing of benefit to the estate. *See In re Phones For All, Inc.,* 288 F.3d 730, 732 (5th Cir.2002). Given the state of affairs at that critical juncture, the court would not have found that the estate could then be said to have *benefitted* from the services of its senior managers to the tune of an additional $1.6 million, when unsecured creditors were facing the prospect of receiving nothing under the plan then on the table. *See id.*

▮▮▮ Riggs and Jepson argue that the court does not need to address whether their claims qualify under section 503(b)(1)(A) because the bonuses were ordinary course of business expenses, as the April 2004 motion expressly acknowledged. An unpaid post-petition claim that falls into the category "ordinary course of business," however, must still qualify as an administrative expense claim that benefit-

---

**25.** Authorizing the debtor to honor its incentive bonus plans was not the primary thrust of the first day motion here under discussion. On the first day, the debtor (and the court) was most concerned that the debtor be able to honor its wage obligations, even though the employees' services were rendered *pre-petition.* The motion was really another species of "critical vendor" motion—with the critical vendors being the employees of the debtor(s). As noted in the previous footnote, whatever rationale one might try to use to justify making such payments, treating the wage claims as administrative expenses cannot be one that

would ever work. The request to permit the debtor to honor its incentive bonus plans was, at best, incidental to the primary thrust of the motion.

**26.** The primary argument advanced was that the bonus payments were within the "ordinary course of the debtor's business" such that court approval was not actually required. The motion was filed anyway, just in case the debtor's guess about ordinary course might be wrong.

ted the estate. *See Toma Steel Supply, Inc. v. TransAmerican Natural Gas Corp. (In Matter of TransAmerican Natural Gas Corp.)*, 978 F.2d 1409, 1415 (5th Cir. 1992). Usually, the benefit for ordinary course payments such as wage claims is assumed. However, such payments can still be challenged (as they were by the creditors' committee) as not benefitting the estate and certainly as not constituting a legitimate exercise of sound business judgment.[27] As it turns out, Riggs and Jepson both resigned shortly after the bonus motion was filed, and well before it would have (or could have) been heard. A

principle justification for claiming that paying these bonuses was a benefit to the estate was the contention that, without such payments, senior managers might leave the company. When Riggs and Jepson actually *did* leave the company, they pulled the rug out from under the best argument for benefit to the estate *vis-a-vis* their bonuses. The court would have been highly unlikely at that point in time to have *approved* a bonus payment to two managers who had already left the company because the bonus could hardly have been said to have benefitted the estate by encouraging them to stay.[28]

27. Incredibly, Riggs and Jepson maintain that the April 2004 motion operates as a judicial admission that bars the Plan Agent from taking a different position, even though, had the motion actually been heard, the debtor would have been obligated to advise the court that Riggs and Jepson had resigned, a factor which most assuredly would have resulted in the court's *denying* the motion at least as to Riggs and Jepson. Although the motion was not itself premised on section 503(b)(1)(A), but rather on section 363(b), the debtor still recognized the need to demonstrate that the proposed payment represented an exercise of "sound business judgment." The motion stated that "[t]he Remaining Payments are necessary to ensure that the Debtors *retain* employees knowledgeable about the Debtors' businesses, to provide an *incentive* for the Debtors' employees to *continue* to provide quality services to the Debtors *at a time when they clearly are needed*, and to allow the Debtors to remain competitive in the job markets in which they maintain operations." April Motion, at ¶ 29. The motion went on to add that "if the Remaining Payments are not paid, it is very likely that many key employees *will resign* from their current employment with the Debtors." *Id.*, at ¶ 30. Then the motion cautioned that "[t]he Debtors are positioned at a crucial stage in these Chapter 11 Cases. If the Debtors lose certain key employees, the Debtor's Plan and efforts to emerge from bankruptcy will be severely hampered." *Id.*, at ¶ 31. Shortly after these representations were made, Riggs and Jepson *did* resign, effectively eviscerating the justification for paying them outlined in these paragraphs. As

the sole basis for authorizing the payments invoked by the debtor was its contention that it was simply seeking ratification of the exercise of its "sound business judgment," no reasonable person would think that paying Riggs and Jepson *anyway*, on the basis of these justifications was "sound business judgment." If anything, it would represent fairly solid grounds for the appointment of a chapter 11 trustee. *See In re Sharon Steel Corp.*, 871 F.2d 1217 (3d Cir.1989).

The doctrine of judicial admission does not apply in any event. The question whether a claim is properly allowable as an administrative expense claim is a question of law, not a question of fact. Facts learned subsequent to the pleading would warrant releasing the Debtor (and now the Plan Agent) from the effect of the doctrine in any event. *See Martinez v. Bally's Louisiana., Inc.*, 244 F.3d 474, 477 (5th Cir.2001). Finally, the unsecured creditors committee raised the issue as well, and the interests of their constituency are justifiably cognizable whether the committee itself continues or not, because payment of this bonus directly affects the bottom line of the reorganized debtor.

28. It should be noted, once again, that neither Riggs nor Jepson indicated any intention to quit on grounds that they had not received all of their bonus payments. When they ultimately *did* quit, it was for reasons other than their not having received bonuses. *See* discussion *supra*. Evidently, both Riggs and Jepson were sufficiently compensated to have stayed, even though bonuses were not paid,

How the court would have ruled on the April 2004 motion, then, offers little guidance to the current inquiry because the court's decision on that motion, at that point in time, would have been affected by the unique circumstances that obtained at that particularly contentious point in the case. Certainly, if the benefit to the estate was supposed to have been continued retention of employees, as was contended in the motion when it was filed in April 2004, no benefit was realized in the case of Riggs or Jepson. They both left. If Riggs and Jepson are to successfully establish a benefit to the estate sufficient to warrant their being paid the bonuses they now seek, it will have to be some other benefit. That, in turn, leads us to consider the broader question of bonus compensation in the context of section 503(b)(1)(A). We return to the case law for further guidance on this point.

■■■■■ Bonuses to employees have indeed been permitted as an allowed administrative expense under section 503(b)(1)(A), depending on certain factors considered by the courts. *See In re Amarex*, 853 F.2d 1526, 1531–32 (10th Cir.1988) (bonus due under employment agreement entitled to administrative priority to the extent earned post-petition); *In re Enron Corp.*, 300 B.R. 201, 208–210 (Bankr. S.D.N.Y.2003) (looking at the terms of the employment agreement to determine whether employee was entitled to bonus); *In re APF Co.*, 270 B.R. 567, 571–75 (Bankr.D.Del.2001) (same); *In re Regensteiner Printing Co.*, 122 B.R. 323, 326 (N.D.Ill.1990) (employees must prove that their bonus payments were necessary to preserve the estate). However, the fact that bonuses are being paid pursuant to a pre-petition contract or understanding is not dispositive of the issue. Courts have emphasized that the terms of the debtor's pre-petition contract arrangement may be *probative* of the reasonable value of post-petition services, but are not *dispositive*. *See In re FBI Distribution Corp.*, 330 F.3d 36, 44 (1st Cir.2003). All that the estate is *required* to pay is the *reasonable value* of those services which were rendered. *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 531, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984). The focus on allowance of administrative claims which enjoy a priority over other creditors is to prevent unjust enrichment of the estate. It is *not* to compensate the creditor (or employee) for his or her loss. *In re R.H. Macy & Co., Inc.*, 170 B.R. 69, 78 (Bankr.S.D.N.Y.1994); *see also In re CIS Corp.*, 142 B.R. 640, 642 (S.D.N.Y.1992) (focus is on *actual* benefit to the estate as opposed to loss sustained by the creditor).

■■■■■ In addition, bonuses, even if they are otherwise deemed to be reasonable compensation for services rendered, can only be paid to the extent they are attributable to *post-petition* services. The Tenth Circuit, in *In re Amarex*, pointed out, in the context of a request for a bonus payment, that administrative claims are a species of priority, and priorities are narrowly construed. *In re Amarex*, 853 F.2d 1526, 1530 (10th Cir.1988). The court quoted a Second Circuit decision to the effect that "a debt is not entitled to priority simply because the right to payment arises after the debtor-in-possession has begun managing the estate." *Id.*, (*quoting*

and were not motivated to stay by the debtor's affirmatively seeking permission to pay their bonuses. Thus, the payment (or nonpayment) of the bonuses had no impact whatsoever on the services performed by Riggs and Jepson, or on their decision to stay or not stay with the company. The estate thus realized no benefit to justify paying Riggs and Jepson their bonuses, at least insofar as benefit is couched in terms of motivating these employees to stay on with the company through its difficulties in bankruptcy.

*Trustees of Amalgamated Ins. Fund v. McFarlin's,* 789 F.2d 98, 101 (2nd Cir. 1986)). Added the court: "[W]hat is crucial is what *consideration* supports the bonus, and whether such consideration, or a portion of it, was pre-petition services." *Id.,* at 1531 (emphasis in original); *see also In re Christian Life Center,* 821 F.2d 1370, 1374 (9th Cir.1987). In *Amarex,* the court concluded that the bonus there was earned over the entire year, though it was not due until the end of the year. Most of the year in question was pre-petition, so most of the bonus was not allowed as an administrative expense claim.

 Finally, it is appropriate to more closely scrutinize bonuses to officers, directors and shareholders of a corporate debtor-in-possession, because of the special fiduciary obligations which are imposed on such persons in chapter 11. *In re Regensteiner Printing Co.,* 122 B.R. 323, 326 (N.D.Ill.1990).[29] Insiders bear the burden of proof as to fairness of any such arrangements. *Id.*[30] The district court in *Regensteiner* stated that bonus payments must be shown to be necessary to preserve the estate, and the fact that the payments might be alleged to be within the ordinary course of business will not relieve the DIP of its burden. Indeed, even if performance has already been rendered by the executive, the DIP is still not relieved of its burden of showing that the bonus payments were necessary to preserve the estate. *Id.,* 122 B.R., at 326–27.

In this case, we have two separate bonuses to consider. First is Riggs' fourth quarter bonus, which if earned, would equal 1/8th of his annual base compensation. *See* Nagel Exhibit 4. Second is the end of year additional bonus sought by Riggs and Jepson (and, if received, to be divided between them), equal to 15% of the amount by which ultimate year-end EBITDA exceeded target EBIDTA for that year. Each will be evaluated in turn, according to the legal principles enunciated above.

 Riggs' fourth quarter bonus, if earned at all,[31] would have to be attribut-

---

**29.** The court cited Supreme Court authority for this important proposition. *See Wolf v. Weinstein,* 372 U.S. 633, 642–45, 649, 83 S.Ct. 969, 975–77, 979, 10 L.Ed.2d 33 (1963); *Pepper v. Litton,* 308 U.S. 295, 306–08, 60 S.Ct. 238, 245–46, 84 L.Ed. 281 (1939); *see also In re Club Devel. & Management Corp.,* 27 B.R. 610, 612 (9th Cir. BAP 1982).

**30.** The court in *Regensteiner* was dealing with a proposed post-petition contractual arrangement with officers and directors. The analysis is still applicable here, however, because the debtor-in-possession is not *bound* to pay its employees on the same terms as they were paid pre-petition. Those arrangements may form the basis for what the debtor decides to pay, but they are not binding on the estate. *See In re FBI Distribution Corp.,* 330 F.3d 36, 44 (1st Cir.2003). All that the estate is required to pay is the reasonable value of those services which were rendered. *NLRB v. Bildisco & Bildisco,* 465 U.S. 513, 531, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984). Thus, even though the DIP, through its board of di-

rectors, may *decide* to pay its executives on the same terms as those executives were paid pre-petition, it is as though the DIP were, for the benefit of the estate, electing to strike the same deal with those executives as did the pre-petition debtor. This it may do, but subject to assurances that it is in fact properly discharging its fiduciary duties.

**31.** The court's factual findings regarding the impact of insurance claims on year 2003 EBITDA show that this bonus was *not* earned. Those factual findings result in a conclusion that no further bonus is due to Riggs beyond the first three quarters. This is so because AMPAM Riggs achieved over 90% of target EBITDA, but less than 95%, based on this court's findings. Riggs was already paid 75% of his bonus by payments in the first three quarters (including a payment that was authorized by one of this court's first day orders). *See* Nagel Exhibit 9. The bonus plan only entitles Riggs to receive 75% of the bonus if at least 90% of target EBITDA is

able to post-petition services to begin with. The fourth quarter would have commenced October 1, 2003 and ended December 31, 2003. The bankruptcy case was filed October 13, 2003. If the bonus was earned daily, then whatever bonus would otherwise be due would have to be reduced by the first twelve days of the quarter, assuming the pre-petition arrangement represents a fair approximation of the reasonable value of services rendered by Riggs for that quarter. *See In re Lason, Inc.,* 309 B.R. 441, 443 (Bankr.D.Del.2004) (calculating post-petition portion of retention bonus allowed as administrative expense by looking to pre-petition retention contract). There are thus two questions here presented: (1) is this bonus arrangement indeed a fair approximation of the reasonable value of the services rendered by Riggs, and (2) if so, is this bonus earned daily, or is it instead earned in some other fashion?

As to the first point, Riggs (the claimant with the burden of proof as to all elements of his claim, including establishing the benefit the estate is said to have received) did not present evidence regarding whether the pay arrangement that he had with AMPAM Riggs was reasonable. To the contrary, Riggs maintained that he was affirmatively *entitled* to his bonus under Texas law, concluding that that was sufficient. As a review of the case law demonstrates, however, it is not. Pre-petition compensation schemes are probative, but not dispositive. *FBI Distribution, supra.* And the burden of proof as to the reasonable value of services rendered to the estate lies with the claimant (in this case, Riggs). *See In re Mid Region Petroleum, Inc.,* 1 F.3d 1130, 1132 (10th Cir.1993) (party claiming entitlement to administra-

tive-expense priority under § 503(b) has the burden of proof); *In re Unger & Associates, Inc.,* 277 B.R. 694, 697 n. 3 (Bankr. E.D.Tex.2001) (same). Riggs simply did not address these issues in his evidentiary presentation.

The court would nonetheless be inclined to find that the quarterly bonus arrangement is reasonable however. Riggs' operating subsidiary generated the largest revenues of any of the operating subsidiaries in the AMPAM family of companies, approaching $6 million in 2003. As president, his base salary was $200,000. The quarterly bonus represented a full third of total expected compensation for Riggs ($200,000 annual salary, plus 50% of salary for achieving target EBITDA). A total gross salary of $300,000 for a person in Riggs' position is entirely reasonable, in this court's view. *See In re Lason, Inc.,* 309 B.R. 441, 443 (Bankr.D.Del.2004).

As for the question of when the bonus was earned, the court concludes that the bonus is earned on a quarterly basis, because only when the quarter's results have been established can it be known whether target EBITDA was achieved for that quarter. A variety of factors could affect the quarterly result, and some of those factors might not occur until relatively late in the quarter. Poor performance at the beginning of the quarter could be offset by spectacular performance at the end—or vice versa. A one-time expense at the beginning of the quarter might cause EBITDA to fall short or even go negative for a period of weeks, only to be offset by strong revenues and low costs at the end of the quarter—or vice versa. In short, as to quarterly bonuses, the company's performance *in that quarter* [32] can only be

---

achieved, but not at least 95% of target EBITDA. The court addresses the legal issue nonetheless, in the interests of analytical completeness.

**32.** This is an important point of emphasis, for reasons that will become clearer with the discussion of the 15% bonus *infra.*

ascertained at the conclusion of that quarter, and only at that point can it be said whether the bonus was or was not earned for that quarter.

■ This does not mean, however, that the employee is thus entitled to the entire quarterly bonus as an administrative expense. To be sure, it cannot be known whether the bonus was earned until the results are complete, but by the same token it cannot be said with any assurance that the result is solely attributable to services performed post-petition. The point bears emphasizing: all compensation, including bonuses, can qualify as an administrative expense only to the extent that it counts as compensation for services rendered to the post-petition estate. *See In re Amarex,* 853 F.2d 1526, 1530–31 (10th Cir.1988). The fact that the bonus only becomes *due* at a point that is post-petition is not a relevant consideration. *Id.; see also Trustees of Amalgamated Ins. Fund v. McFarlin's,* 789 F.2d 98, 101 (2nd Cir.1986).[33] Absent more particularized evidence regarding performance within the quarter (and such evidence was not presented), the *most* the court can say, in fairness, and with a view to narrowly construing priorities, is that, if a bonus *were* otherwise due attributable to fourth quarter performance, Riggs would only be entitled to that portion of the bonus equivalent to the percentage of days of the quarter during which the company was in bankruptcy.

■ The additional bonus of 15% of EBITDA in excess of the target is a differ-ent issue. One approach would suggest that this bonus too is due as post-petition compensation, on the theory that this bonus cannot ever be due until the year's results are completed. Further support for this approach comes from the fact that quarterly bonuses were paid for the first three quarters, indicating that AMPAM Riggs was "on track" to meet its target EBITDA as of the conclusion of those three quarters. Thus, concludes the argument, any excess EBITDA would be attributable to fourth quarter activities and results, warranting paying the bonus as compensation for services rendered for the most part in the fourth quarter.

The counter to this argument, however, is that the court was not supplied with the quarterly results for the first three quarters. Under the terms of the incentive bonus plan, so long as EBITDA at least *meets* the progress expected as of that quarter in order to stay on track to meet target EBITDA at the end of the year, the quarterly bonus would be due and payable. If EBITDA *exceeds* the target in any of those quarters, there would be no change in the quarterly bonus paid. Thus, the fact that bonuses were paid in each of the first three quarters only tells us that target EBITDA for that quarter was at least met, but does not tell us whether target EBITDA for that quarter was *exceeded* (much less by how much). On this record, it is not known whether, in fact, EBITDA for AMPAM Riggs was exceeding its target in the first three quarters or not. Thus, it is not possible to

---

**33.** The logic becomes more obvious just by shifting the filing date. Suppose in our case, for example, the debtor filed its petition on December 15, 2003, instead of October 13, 2003. It would then be that much clearer that a substantial portion of the effort that yielded quarter-end EBITDA was rendered pre-petition, yet the bonus would still not be due until results for the quarter were complete. The bonus, on those facts, becomes much more obviously less likely to be attributable to the mere two weeks' service at the end of the quarter. The statute's mandate is clear. Only post-petition services qualify for administrative expense treatment. *See* 11 U.S.C. § 503(b)(1)(A); *see also Trustees of Amalgamated Ins. Fund v. McFarlin's,* 789 F.2d 98, 101 (2nd Cir.1986)

know with any assurance whether, assuming AMPAM Riggs *did* exceed its target EBITDA at the end of the year, the excess was earned in the last quarter or one or more of the earlier three quarters. Without that breakdown, it cannot be said with any certainty that the services for which the bonus represents compensation were rendered pre-petition or post-petition. Unless the services for which the bonus represents compensation were in fact rendered *after* the petition was filed, the bonus does not qualify as an allowable administrative expense under section 503(b)(1)(A). *See* discussion *supra.*

As the burden of proof for obtaining allowance of an administrative expense claim lies with the movants, the failure to put on proof to confirm whether the services giving rise to the alleged bonus were rendered pre-petition or post-petition results in the claimants not sustaining their burden, and so resulting in a finding that the claim for the 15% bonus cannot be allowed as an administrative expense claim. *See In re Mid Region Petroleum, Inc.,* 1 F.3d 1130, 1132 (10th Cir.1993) (party claiming entitlement to administrative-expense priority under § 503(b) has the burden of proof); *In re Unger & Associates, Inc.,* 277 B.R. 694, 697 n. 3 (Bankr. E.D.Tex.2001) (same).

The court finds and concludes that the estate does not owe a bonus to Riggs or Jepson, after adjusting 2003 EBITDA based on the factual findings in this decision. The court further finds that, even if bonuses were owed, the additional bonus of 15% of earnings in excess of target EBITDA could not be paid because this bonus has not been shown to qualify as an actual and necessary expense of estate administration. In other words, without knowing what portion (if any) of the annual results is attributable to performance in pre-petition quarters, as opposed to the post-petition fourth quarter (save for 12 days), the court lacks sufficient evidence to find that the bonus represents compensation for services rendered by Riggs and Jepson to the post-petition debtor(s). Thus, the burden of proof not having been sustained, this aspect of the administrative expense claim could not be allowed under section 503(b)(1)(A), even if the evidence had otherwise established that AMPAM Riggs *had* exceeded 2003 target EBITDA. The court finally finds that, at least as a matter of law, if AMPAM Riggs *had* met target EBITDA for the fourth quarter, Riggs' claim for his fourth quarter bonus could qualify as an administrative expense, provided it were reduced by a percentage derived from the number of days of that quarter which were pre-petition.

 Riggs and Jepson argued that Texas law requires the estate to pay them their bonuses because they were "earned" prior to their resigning from the company. The estate, however, is not bound to pay the bonuses in question by virtue of its pre-petition incentive bonus plan because that plan applied to the pre-petition debtor, but was not necessarily binding on the post-petition debtor-in-possession. *See In re FBI Distribution Corp.,* 330 F.3d 36, 44 (1st Cir.2003). All that the estate is *required* to pay is the *reasonable value* of those services which were rendered. *NLRB v. Bildisco & Bildisco,* 465 U.S. 513, 531, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984). Although, as earlier noted, pre-petition compensation schemes are a valid marker for determining what constitutes a benefit to the estate for services rendered by employees, those schemes at the end of the day are not binding on the bankruptcy estate. At the end of the day, the standard for paying all administrative claims—including wage claims—is the same. *See In re R.H. Macy & Co., Inc.,* 170 B.R. 69, 78 (Bankr.S.D.N.Y.1994); *see also In re*

*CIS Corp.,* 142 B.R. 640, 642 (S.D.N.Y. 1992) (focus is on *actual* benefit to the estate as opposed to loss sustained by the creditor).

Because the court concludes that the *sine qua non* for allowing this claim is a showing of benefit to the estate as that expression has been construed by the courts (including the Fifth Circuit), the court does not need to reach the question whether, as a matter of Texas law, the bonus had to be paid. While it not necessary to decide the issue under Texas law, the court notes its agreement with the approach suggested by the Plan Agent. There is a substantive distinction to be drawn between the entitlement of employees who were wrongfully terminated, or who were forced to resign, on the one hand, and the entitlement of employees who resign voluntarily, with full knowledge of the consequences under the terms of their employment. As one court noted: "[a]n employee would not earn any bonus for a given year if he voluntarily terminated his employment prior to [the bonus date], or was terminated for good cause. If the employee was employed on [the bonus date], his bonus was earned for that year." *Enstar, et al. v. Bass,* 737 S.W.2d 890, 893 (Tex.App.—El Paso 1987). In this case, Riggs and Jepson both resigned voluntarily before the bonus date, i.e., prior to the time that the books were actually closed for year 2003. What is more, there is no good reason to relieve an employee of the specific terms and conditions of a compensation scheme when that employee voluntarily foregoes the benefit of that scheme by resigning without good cause. Under the terms of the incentive bonus scheme in place at AMPAM, employees who quit before their bonus was to be paid were not entitled to receive that bonus. There are no facts to indicate that these bonuses were somehow withheld in the hopes that Riggs and Jepson would quit.

None of the senior management had received their bonuses at the time that Riggs and Jepson quit. Thus, the notion that this condition unfairly required these employees to stay with the company is a red herring.

For the reasons stated, the court rules that the administrative claim be denied, and the objection be sustained. An order consistent with this decision will be entered separately.

**ORDER DISALLOWING APPLICATION OF GERALD RIGGS AND RICK JEPSON FOR PAYMENT OF ADMINISTRATIVE EXPENSE CLAIM**

CAME ON for trial the foregoing matter. The court has entered its Memorandum Decision which incorporates the court's findings of fact and conclusions of law. Based thereon, the court denies the application of Gerald Riggs and Rick Jepson for Payment of Administrative Expense Claim.